## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLEN FAMILY FOODS, INC., *et al.*,1 | Case No. 11-11764 (KJC) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 15** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (I) APPROVING POST-PETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

This matter having come before the Court on June ___, 2011 (the "*Interim Hearing*"), upon the *Debtors' Motion for Entry of Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* (the "*Motion*") filed by Allen Family Foods, Inc. ("*AFF*"), Allen's Hatchery, Inc. ("*AHI*"), and JCR Enterprises, Inc. ("*JCR*"), each a debtor and debtor-in-possession (AFF, AHI, and JCR are collectively referred to herein as the "*Debtors*") in the above-captioned chapter 11 cases (collectively, the "*Chapter 11 Cases*"), pursuant to sections 105, 361, 362, 363, 364(c), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), seeking entry of an order (this "*Order*"), *inter alia*:

---

1       The Debtors in these cases, along with the last four digits of each Debtor's tax identification number, are: Allen Family Foods, Inc. (7949), Allen's Hatchery, Inc. (8943), and JCR Enterprises, Inc. (8322). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 126 N. Shipley Street, Seaford, DE 19973.

(i)     authorizing the Debtors to obtain secured post-petition financing and other extensions of credit on a superpriority basis (the "*DIP Facility*") pursuant to the terms and conditions of that certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits, and annexes thereto, and as at any time amended, supplemented, restated, or otherwise modified from time to time, the "*DIP Loan Agreement*")[2] between the Debtors and MidAtlantic Farm Credit, ACA (in its capacity as post-petition lender, the "*DIP Lender*"), substantially in the form annexed as Exhibit B to the Motion;

(ii)     authorizing the Debtors to execute and deliver the DIP Loan Agreement and related instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender to give effect to the terms thereof among the Debtors and the DIP Lender (the DIP Loan Agreement and such related instruments, security agreements, pledges, assignments, control agreements and other documents, as at any time amended, being collectively called the "*DIP Financing Documents*"), and to perform such other acts as may be necessary or desirable in connection with the DIP Financing Documents;

(iii)     granting the DIP Facility and the DIP Obligations (as defined below) allowed superpriority administrative expense claim status in each of the Chapter 11 Cases, and in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such case or any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "*Successor Cases*");

(iv)     granting to the DIP Lender automatically perfected security interests in and liens upon all of the Collateral (as defined below), including, without limitation, all property

---

[2] Capitalized terms used but not defined in this Order shall have the meanings given to them in the DIP Loan Agreement.

YCST01:11148888.4                                                                          070206.1001

constituting Cash Collateral (as defined below), which liens shall have the priorities set forth herein;

(v) authorizing the use of Cash Collateral under the Pre-Petition Loan Documents (as defined below) in the DIP Financing Documents, as limited pursuant hereto; and

(vii) scheduling a final hearing (the "*Final Hearing*") to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the DIP Financing Documents, the stipulations of counsel, and the evidence submitted at the Interim Hearing; and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), (d), and 9014; and objections at the Interim Hearing to consider the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, is otherwise fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for borrowed money allowable as an administrative expense under Bankruptcy Code section 503(b)(1); and adequate protection being provided on account of the interests of holders of liens on the property of the estates on which liens are to be granted;

Based upon the record established at the Interim Hearing, and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. <u>Petition Date</u>. On June 9, 2011 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

B.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     <u>Stipulations</u>.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of the parties in interest as set forth in paragraph 21 herein, the Debtors admit, stipulate, acknowledge, and agree that (collectively, paragraphs (C(i) through C(v) hereof shall be referred to herein as the "*Stipulations*"):

(i)     *Pre-Petition Loan Facilities*.  The Debtors are parties with MidAtlantic Farm Credit, ACA, in its capacity as Lender (the "*Pre-Petition Lender*") to that certain (i) Second Amended and Restated Prepay And Working Capital Revolving Credit Agreement dated January 13, 2010, as amended as of June 25, 2010 and on April 8, 2011, ("*Prepay Loan Agreement*"), and (ii) Second Amended and Restated Step Down Credit Agreement dated January 13, 2010, as amended as of June 25, 2010 and on April 8, 2011 ("Stepdown Loan Agreement" and together with the Prepay Loan Agreement and all amendments thereto and modifications thereof, the "*Pre-Petition Loan Agreements*"), pursuant to which the Pre-Petition Lender provided (i) AHI with a $55 million secured revolving credit facility under which AHI could obtain revolving credit loans and letters of credit (the "*Pre-Petition Revolver*"), and (ii) AFF with a $25 million secured term loan facility (the "*Pre-Petition Term Loan*" and together with the Pre-Petition Revolver, the "*Pre-Petition Loan Facilities*").

(ii)     *Pre-Petition Obligations*.  As of the Petition Date, there was outstanding under the Pre-Petition Loan Facilities or was otherwise owed to the Pre-Petition Lender (a) revolving credit loans (including two protective advances made by the Pre-Petition Lender to AHI) in the approximate principal amount of $59,122,308 (the "*Pre-Petition Revolver Loans*")

and (b) a term loan in the approximate principal amount of $23,200,000 (the "*Pre-Petition Term Loan*"; and, together with the Pre-Petition Revolver Loans and the Pre-Petition Term Loan, and all other obligations of any Debtor to the Pre-Petition Lender on the Petition Date and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time chargeable to any of the Debtors in connection therewith, referred to as the "*Pre-Petition Obligations*").

(iii)     *Pre-Petition Collateral.*     To secure the Pre-Petition Obligations, each Debtor granted to the Pre-Petition Lender, pursuant to the Pre-Petition Loan Agreements and various mortgages and related security documents (collectively with the Pre-Petition Loan Agreements, as at any time amended, the "*Pre-Petition Loan Documents*"), security interests in and liens upon (the "*Pre-Petition Lender Liens*") (a) all or substantially all of such Debtor's personal property, including, without limitation, all accounts, inventory (including grain and feed, livestock, eggs, dressed poultry inventory, vaccines, and packaging inventory), farm products, raw materials and work in progress, finished goods, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment (including machinery and fixtures), and books and records, and (b) certain parcels of real property of certain Debtors, and improvements thereto, which parcels are located in Sussex County, Delaware, Caroline County, Maryland, Dorchester County, Maryland, Talbot County, Maryland, and Randolph County, North Carolina (all such real and personal property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, being collectively called the "*Pre-Petition Collateral*").

(iv)     *Pre-Petition Lender Liens.*     The Pre-Petition Lender Liens on the Pre-Petition Collateral were perfected as of the Petition Date.

YCST01:11148888.4                                          070206.1001

(v)     *Validity of Pre-Petition Lender Liens and Obligations.*   The Pre-Petition Lender has asserted, and the Debtors acknowledge and stipulate, that (a) the Pre-Petition Lender Liens are legal, valid, binding, enforceable, non-avoidable and perfected, (b) as of the Petition Date, the Pre-Petition Lender Liens had priority over any and all other security interests and liens on the Pre-Petition Collateral, subject only to certain security interests and liens otherwise permitted by the Pre-Petition Loan Documents (to the extent any such permitted security interests and liens were valid, properly perfected, non-avoidable, and senior in priority to the Pre-Petition Lender Liens as of the Petition Date, the "*Permitted Pre-Petition Prior Liens*")[3]; (c) the Obligations under (and as defined in) the Pre-Petition Loan Agreement, constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Loan Documents (except as such enforceability may be limited by any stay of enforcement arising from section 362 of the Bankruptcy Code); (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Lender Liens or the Pre-Petition Obligations exist, and no portion of the Pre-Petition Lender Liens or the Pre-Petition Obligations is subject to any challenge or defense, including, without limitation, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action; and (f) the Debtors have waived, discharged, and released any right they may have to challenge any of the Pre-Petition Obligations and the security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses of action against the Pre-Petition Lender.

---

[3] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Pre-Petition Prior Lien is valid, senior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party in interest, including, without limitation, the Debtors, the DIP Lender, the Pre-Petition Lender, and the Committee, to challenge the validity, priority, perfection, or extent of any such Permitted Pre-Petition Prior Lien.

D.    <u>Findings Regarding the DIP Facility</u>.

(i)    *Request for the DIP Facility.*  The Debtors seek authority to (a) enter into and perform their obligations under the DIP Financing Documents on the terms described therein and in this Order, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases.  At the Final Hearing, the Debtors will seek final approval of the proposed post-petition financing and use of Cash Collateral arrangements with the DIP Lender pursuant to a proposed final order (the "*Final Order*"), which shall be form and substance acceptable to the DIP Lender and the Pre-Petition Lender (collectively, the "*Senior Lenders*") and notice of which Final Hearing and Final Order will be provided in accordance with this Order.

(ii)    *Priming of Certain Liens.*  The priming of the Pre-Petition Lender Liens, pre-petition liens of Wilmington Trust Company ("*Wilmington Trust*") under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to grant them the prospective ability to sell certain assets at going concern value and to allow the Debtors to continue the operations of other segments of their respective businesses for the benefit of their estates and their creditors. However, the Pre-Petition Lender and Wilmington Trust are entitled to receive adequate protection as set forth in this Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in value of their respective interests in the Pre-Petition Collateral (including Cash Collateral) resulting from any Debtor's use, consumption, sale, collection, or other disposition of any Pre-Petition Collateral.

(iii)    *Need for the DIP Facility and Use of Cash Collateral.*  The Debtors' need to use Cash Collateral as provided herein and to obtain credit pursuant to the DIP Facility is immediate and critical to enable the Debtors the prospective ability to sell certain assets at going concern value and to allow the Debtors to continue the operations of other segments of their

respective businesses and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, maintain business relationships with their vendors, suppliers, and customers, to pay their employees, preserve their poultry collateral, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral as provided herein, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors, and their equity holders. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms.* Given their current financial condition, financing arrangements, and capital structure, the Debtors and their advisors have determined that the Debtors are not viably able to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors and their advisors have determined that the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors and their advisors also have determined that the Debtors are not viably able to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a post-petition basis is not otherwise available without (x) this Court's approval of the DIP Facility, the DIP Financing Documents (and the transactions contemplated thereby), and all rights and remedies of the DIP Lender in connection therewith; and (y) granting the DIP Lender (1) as security for the prompt payment of all DIP Obligations (as defined below), a security interest in and lien upon all of each Debtor's assets

YCST01:11148888.4

070206.1001

(both real and personal), including, without limitation, all of each Debtor's real estate and improvements thereto, accounts, inventory (including grain and feed, livestock, eggs, dressed poultry inventory, vaccines, and packaging inventory), farm products, raw materials and work in progress, finished goods, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment (including machinery and fixtures), and books and records (both tangible and electronic) relating to any assets of such Debtor, and all proceeds (including insurance proceeds) of the foregoing, in each case whether such assets are now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, including, without limitation, all Pre-Petition Collateral, being collectively hereinafter referred to as the "*Collateral*"), and that such security interests and liens have the priority hereinafter set forth (<u>provided</u> that the Collateral shall not include Avoidance Claims or Avoidance Proceeds (each as defined below) except as hereinafter expressly provided); (2) adequate protection for the Pre-Petition Lender's interests in the Pre-Petition Collateral pursuant to sections 361 and 363 of the Bankruptcy Code; and (3) superpriority claims.

(v)     *Use of Proceeds of the DIP Facility.*  As a condition to DIP Lender's entry into the DIP Loan Agreement, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtors have agreed that proceeds of the DIP Facility will be used in accordance with the terms and conditions of the DIP Financing Documents and in accordance with, and for the purposes specified in, the Debtors' cash budget (as at any time amended with the written consent of the DIP Lender (as and to the extent provided in the DIP Loan Agreement), the "*Budget*").

E.     <u>Adequate Protection</u>.  For so long as any Pre-Petition Obligations remain outstanding, the Pre-Petition Lender is entitled to receive adequate protection to the extent of any diminution in value of its interests in the Pre-Petition Collateral (including Cash Collateral).

YCST01:11148888.4                                                                070206.1001

Pursuant to sections 361 and 363, the Pre-Petition Lender will receive the following measures of adequate protection: (a) adequate protection liens, as more fully set forth in paragraph 8(a) hereof; and (b) application of the proceeds of the Designated Accounts (as defined below), the Designated Inventory (as defined below), and Other Designated Collateral (as defined below) to the payment of the Pre-Petition Obligations and DIP Obligations as provided in paragraphs 8(b) and (d).

        F.      Section 506(c).  The Motion requests inclusion of a provision that the Senior Lenders are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver will be without prejudice to the contention of the DIP Lender that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code) in light of (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out (as defined below), and (ii) the Pre-Petition Lender's agreement to subordinate its liens to the Carve-Out and the DIP Liens (as defined below).  Such waiver shall be addressed by, and subject to, the Final Order.

        G.      Good Faith of the DIP Lender.

        (i)      *Willingness to Provide Financing*.  The DIP Lender has indicated a willingness to provide financing to the Debtors subject to (a) the entry of this Order, (b) approval of the terms and conditions of the DIP Facility and the DIP Financing Documents, and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Order and the DIP Financing Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Order or any other order.

-10-

(ii)   *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Financing Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The DIP Facility, the DIP Financing Documents, and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors and the Senior Lenders.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Order.

H.   <u>Notice</u>.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided, and certified to, by the Debtors, whether by facsimile, email, hand delivery, overnight courier, or first class United States mail, to certain parties in interest, including:  (i) the U.S. Trustee, (ii) the Internal Revenue Service, (iii) counsel to the Senior Lenders, (iv) Wilmington Trust, and (v) the Debtors' thirty (30) largest unsecured creditors.  The parties have made reasonable efforts to afford the best notice possible under the circumstances, and such notice is good and sufficient under sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), to permit the relief set forth in this Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1.   <u>Grant of Motion; Authorization of Interim Financing</u>.  The Motion is hereby

GRANTED and the DIP Facility is hereby authorized and approved, and the use of Cash Collateral is hereby authorized and approved, in each case on an interim basis and subject to the terms and conditions set forth in this Order.

2.   Objections Overruled. All objections to the Motion made at the Interim Hearing, to the extent not withdrawn or resolved, are hereby overruled.

3.   Authorization of the DIP Financing. The Court hereby authorizes and approves (i) the Debtors' execution and delivery of the DIP Loan Agreement in substantially the form annexed to the Motion (with such changes, if any, as were addressed to the Court at the Interim Hearing or are otherwise authorized to be made as amendments to the DIP Loan Agreement in accordance with this Order) and all of the other DIP Financing Documents; (ii) the Debtors' obtaining advances under the DIP Facility from time to time up to an aggregate principal amount outstanding at any time of $5,000,000 (on an interim basis) in accordance with the DIP Loan Agreement plus interest, fees, and other charges payable in connection therewith, and to incur any and all liabilities and obligations thereunder and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Financing Documents; and (iii) the Debtors' satisfying all conditions precedent under the DIP Financing Documents and performing all obligations hereunder and under the DIP Financing Documents in accordance with the terms hereof and thereof; provided, however, that, during the period from the date of entry of this Order through the date on which the Final Hearing is concluded (the "*Interim Period*") and subject to all of the terms and conditions in the DIP Loan Agreement, the Debtors may obtain advances under the DIP Facility only to the extent necessary to avoid immediate and irreparable harm to the Debtors, which, for purposes hereof, shall mean proceeds of the DIP Facility used (a) to pay any of the DIP Obligations (as defined below), (b) to pay any of the Pre-Petition Obligations to the extent authorized herein or provided for in the DIP Loan Agreement, (c) for

-12-

any other purposes specified in the Budget, (d) to make adequate protection and other payments to the Pre-Petition Lender to the extent authorized or required herein, and (e) to pay other expenses that are required or authorized to be paid under the DIP Loan Agreement. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the advances under the DIP Facility and may rely upon any Debtor's representations that the amount of any advances under the DIP Facility requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Financing Documents, the Budget, and Bankruptcy Rule 4001(c)(2).

4.     Execution, Delivery and Performance of DIP Financing Documents. The DIP Financing Documents may be executed and delivered on behalf of each Debtor by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Financing Documents for and on behalf of such Debtor, and the DIP Lender shall be conclusively authorized to rely upon any such person's executing and delivering any of the DIP Financing Documents as having done so with all requisite power and authority. Upon execution and delivery thereof, the DIP Financing Documents shall constitute valid and binding obligations of the Debtors and shall be enforceable against the Debtors in accordance with their terms. In furtherance of the provisions of paragraph 3 of this Order, the Debtors are authorized and directed to do and perform all acts; to make, execute, and deliver to DIP Lender all instruments and documents (including, without limitation, the execution of notes, security agreements, assignments, control agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements, and intellectual property filings); and to pay all filing and recording fees as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP

YCST01:11148888.4     070206.1001

Financing Documents, to validate the perfection of the DIP Liens or as otherwise required or contemplated by the DIP Financing Documents.

5.     DIP Liens.

(a)     As security for the Debtors' payment and performance of the DIP Facility, all interest, fees and other charges at any time or times payable by the Debtors to the DIP Lender in connection with the DIP Facility or otherwise pursuant to any of the DIP Financing Documents, and all other "Obligations" under (and as defined in) the DIP Loan Agreement, including, without limitation, liabilities of the Debtors at any time or times associated with the DIP Lender's provision of Bank Product Obligations (collectively, the "*DIP Obligations*"), the DIP Lender shall have, and is hereby granted valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens upon all of the Collateral (all of the foregoing are collectively called the "*DIP Liens*"), as follows:

(i)     Unencumbered Collateral.  Pursuant to section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon (x) all Collateral that, as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens or to valid and non-avoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date) as permitted by section 546(b) of the Bankruptcy Code, and (y) all Collateral (other than direct proceeds of Pre-Petition Collateral that are subject to valid, perfected, and non-avoidable liens on the Petition Date) that is created or acquired, or arises, after the Petition Date.

(ii)     Encumbered Collateral.  Pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected, and non-avoidable liens in existence on the Petition Date or

to valid and non-avoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by section 546(b) of the Bankruptcy Code.

(iii)    <u>Extent of Priming DIP Liens</u>.  Pursuant to section 364(d) of the Bankruptcy Code, and notwithstanding anything to the contrary in paragraph 5(a)(ii) of this Order, the DIP Liens shall be senior in priority to and shall prime (x) all other Senior Lender Liens (as defined below); and (y) all liens of Wilmington Trust on or claims or other legal or equitable interests of Wilmington Trust in or to any Collateral.

(b)    Notwithstanding the foregoing provisions of this paragraph 5 or anything to the contrary in the DIP Financing Documents, the DIP Liens shall be subordinate to the Carve-Out (as defined below) as and to the extent set forth in paragraph 10 and shall not attach to any of the following property:  (i) any claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code (the "*Avoidance Claims*") or (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claim (the "*Avoidance Proceeds*").  Except as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any security interest or other lien heretofore or hereafter granted in the Chapter 11 Cases or any Successor Cases; shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code or *pari passu* with any security interest or other lien (whether granted or arising prior to or after the Petition Date) that is avoided and preserved for the benefit of any Debtor's estate under section 551 of the Bankruptcy Code; and no person or entity who pays (or, through the extension of credit to any Debtor, causes to be paid), any of the DIP Obligations shall be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or security interests granted to or in favor of, or conferred upon, the DIP Lender by the terms of the

YCST01:11148888.4    070206.1001

DIP Financing Documents or this Order, until Full Payment of the Pre-Petition Obligations and the DIP Obligations.

6. <u>DIP Superpriority Claim</u>. All DIP Obligations shall have administrative priority in accordance with, and shall constitute an allowed superpriority claim (the "*DIP Superpriority Claim*") pursuant to, section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in the Chapter 11 Cases and any Successor Cases of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(e), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code. No costs or administrative expenses that have been or may be incurred in the Chapter 11 Cases, whether in any matters or proceedings related hereto or in any Successor Cases, and no priority claims or superpriority claims, are or will be prior to or on a parity with the DIP Superpriority Claim of the DIP Lender for the DIP Obligations; <u>provided</u>, <u>however</u>, that for purposes of this Order, the DIP Superiority Claim shall not attach to any Avoidance Claims or the Avoidance Proceeds ~~(unless a Debtor shall grant or consent to a superpriority claim in favor of any other person or entity with respect to such property, in which event all such property shall be subject to the DIP Superpriority Claim)~~. Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject to the Carve-Out.

7. <u>Cash Collateral</u>.

(a) <u>Dominion Depository Accounts</u>. If requested by the DIP Lender, the Debtors shall cause all proceeds of Collateral ("*Cash Collateral*") to be deposited into one or more bank accounts with one or more financial institutions designated by the DIP Lender (each a "*Dominion Depository Account*"); and, if any such Cash Collateral is initially deposited into an account of a Debtor at a bank other than one designated by the DIP Lender, Debtors shall cause all such Cash Collateral to be promptly transferred to one or more Dominion Depository

-16-

Accounts. Prior to the deposit of Cash Collateral to a Dominion Depository Account, the Debtors shall be deemed to hold such proceeds in trust for the benefit of the Senior Lenders.

(b)    Application of Cash Collateral.  The Debtors shall be entitled to use all Cash Collateral arising from Pre-Petition Collateral for the payment of the necessary and approved expenses as provided for and in accordance with the Budget, provided, any Cash Collateral in excess of the Budget expenses shall be applied to the payment of the DIP Obligations.  The DIP Lender shall be authorized to apply the Cash Collateral to the payment or cash collateralization of the DIP Obligations and, after Full Payment thereof, to the Pre-Petition Obligations to the extent of the Pre-Petition Lender Replacement Liens (as defined below) and thereafter to the Debtors subject to the respective liens and claims of pre-petition liens of the Pre-Petition Lender and Wilmington Trust; provided, however, that the Debtors may not at any time use Cash Collateral for any Prohibited Purposes (as defined below); provided, further, however, that no payments shall be made with respect to the Pre-Petition Obligations prior to the expiration of any applicable lien investigation period . For so long as no Event of Default under the DIP Loan Agreement occurs or exists and no Pre-Petition Obligations or DIP Obligations are outstanding, the Debtors shall be authorized to use Cash Collateral, to the extent of any collected and available balances in any Dominion Depository Accounts, for such purposes as proceeds of the DIP Loans are authorized to be used under the DIP Loan Agreement, this Order, and the Budget. Nothing in this Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Order and the DIP Financing Documents and in accordance with the Budget.

8.    Adequate Protection of Pre-Petition Lender; Reservation of Rights.  As adequate protection of the Pre-Petition Lender pursuant to sections 361, 363 and 364 of the Bankruptcy

Code for the Debtors' use, consumption, sale, collection or other disposition of any Pre-Petition Collateral (including, without limitation, Cash Collateral) and for the grant of the priming DIP Liens pursuant to this Order, the following measures of adequate protection are granted:

(a)     Adequate Protection Liens.  The Pre-Petition Lender, as the grantee in respect of the Pre-Petition Lender Liens, shall be granted replacement liens, effective as of the Petition Date, in and to all of the Collateral, whether now existing or hereafter created, acquired or arising (the "*Pre-Petition Lender Replacement Liens*"), as partial adequate protection to the Pre-Petition Lender to the extent of any diminution in value of its interests in the Pre-Petition Collateral caused by (i) any Debtor's use, consumption, sale, collection or other disposition of any Pre-Petition Collateral from and after the Petition Date or (ii) the grant of the priming DIP Liens pursuant to this Order.  The Pre-Petition Lender Replacement Liens shall be senior to all other security interests in, liens on, or claims against any of the Collateral (including, without limitation, the liens and claims of Wilmington Trust), except (i) the DIP Liens and (ii) any legal, valid, perfected and non-avoidable liens in existence on the Petition Date (other than those in favor of Wilmington Trust) with respect to any Pre-Petition Collateral to the extent that such liens under applicable law are senior to Pre-Petition Lender's Pre-Petition Lender Liens with respect to the Pre-Petition Collateral.   Notwithstanding the foregoing provisions of this paragraph 8(a) or anything to the contrary in the DIP Financing Documents, the Pre-Petition Lender Replacement Liens shall be subordinate to the Carve-Out (as defined below) as and to the extent set forth in paragraph 10.

(b)     Application of Proceeds of Designated Accounts.  All collections and proceeds of the Debtors' accounts receivable and other rights to payment existing or arising on or prior to the Petition Date (the "*Designated Accounts*"), including, without limitation, all payments by account debtors indebted to any Debtor with respect to any transaction entered into

-18-

or concluded prior to the Petition Date, <sup>[handwritten insertion]</sup> may be applied to pay (or in the case of contingent

*[handwritten margin insertion: ; PROVIDED, HOWEVER, THAT NO PAYMENTS SHALL BE MADE WITH RESPECT TO THE Pre-Petition Obligations PRIOR TO THE EXPIRATION OF ANY APPLICABLE LIEN INVESTIGATION PERIOD]*

obligations, cash collateralize) the DIP Obligations in such order of application as the DIP

Lender may elect in its discretion, in each case until Full Payment thereof, and thereafter may be

applied to the balance of the Pre-Petition Obligations (including, without limitation, Pre-Petition

Term Loan) until Full Payment thereof. The Debtors shall use their reasonable, good faith

efforts to provide promptly to the Senior Lenders reconciliations identifying the portion of each

deposit to any Dominion Depository Account that represents proceeds of the Designated

Accounts so as to assist the Senior Lenders in the application of the proceeds of the Designated

Accounts in accordance herewith. The Senior Lenders shall be entitled to assume that all

deposits to any Dominion Depository Account and all collections of accounts receivable received

by Debtors after the Petition Date constitute proceeds of Designated Accounts, until such time as

the Senior Lenders have received and applied to their respective claims (by payment or cash

collateralization) an amount equal to the aggregate balance of Designated Accounts on the books

and records of Debtors as of the Petition Date.

(c) <u>Use of Designated Inventory</u>. As a condition of the Debtors' use,

consumption, sale, or other disposition in the ordinary course of business of all inventory in all of

its forms, including without limitation all grain and feed, all pre-paid grain and feed, livestock,

eggs, dressed poultry inventory, vaccines, packaging inventory, all raw materials and work-in-

process thereof, finished goods thereof and materials used or consumed in the manufacture or

production thereof that were in existence on the Petition Date (collectively, "*Designated*

*Inventory*"), the Debtors shall, concurrently with any such use, consumption, sale, or other

disposition thereof, use their reasonable, good faith efforts to provide promptly to the Senior

Lenders information regarding the use, consumption, sale, or other disposition of Designated

Inventory. Based upon representations of the Debtors at or prior to the Interim Hearing, the total

-19-

*; PROVIDED, HOWEVER, THAT NO PAYMENTS SHALL BE MADE WITH RESPECT TO THE PRE-PETITION OBLIGATIONS PRIOR TO THE EXPIRATION OF ANY APPLICABLE LIEN INVESTIGATION PERIOD.*

cost of all Designated Inventory as of the Petition Date was approximately $33,256,666 (the "*Designated Inventory Amount*").

(d) <u>Disposition of Other Designated Collateral</u>. In consideration of the Debtors' use, consumption, sale, or other disposition of Collateral in existence on the Petition Date other than Designated Inventory or Designated Accounts, including, without limitation, real estate, equipment (including fixtures), contract rights, general intangibles, chattel paper, documents, and instruments ("*Other Designated Collateral*"), the Senior Lenders may apply any and all proceeds realized from any sale or other disposition of such Other Designated Collateral (i) first to the DIP Lender for application to the DIP Obligations in such order of application as DIP Lender may elect in its discretion and until Full Payment thereof, and (ii) then to the Pre-Petition Lender for application to the Pre-Petition Obligations in such order of application as the Pre-Petition Lender may elect in its discretion and until Full Payment thereof. Nothing in this Order shall be construed to be a consent by the Senior Lenders to any sale or other disposition of any Other Designated Collateral.

(e) <u>Right to Additional Protections</u>. Nothing in this Order shall be deemed to be a waiver by the Pre-Petition Lender of its right to request additional or further protection of its interests in any Collateral. Moreover, nothing in this Order or in any of the DIP Financing Documents constitutes an admission by the Senior Lenders of the quantity, quality, or value of any Collateral or a finding of the adequacy of the protections afforded herein with respect to the interests of the Senior Lenders in any Collateral. The Pre-Petition Lender shall be deemed to have reserved all rights to assert entitlement to the benefits of section 507(b) of the Bankruptcy Code in connection with any use, sale, collection or other disposition of any of the Collateral or the priming by the DIP Liens of Pre-Petition Lender's interests in the Collateral, to the extent that

the protection afforded by this Order to the Pre-Petition Lender's interests in any Collateral proves to be inadequate.

(f)    Adequate Protection for Wilmington Trust.  Wilmington Trust, as grantee in respect of certain pre-petition lender liens to secure all indebtedness and obligations of Debtors to Wilmington Trust, is hereby granted replacement liens, effective as of the Petition Date, in and to all of the Collateral, whether now existing or hereafter created, acquired or arising (the "*Wilmington Trust Replacement Liens*"), as adequate protection to Wilmington Trust to the extent of any diminution in value of its interest in the Pre-Petition Collateral caused by (i) any Debtor's use, consumption, sale, collection or other disposition of any Pre-Petition Collateral from and after the Petition Date or (ii) the grant of the priming DIP Liens pursuant to this Order. The Wilmington Trust Replacement Liens shall be deemed subordinate and junior to all of the DIP Liens, Pre-Petition Lender Replacement Liens, and Pre-Petition Lender Liens.  If and to the extent that the protections afforded herein for the liens of Wilmington Trust prove to be inadequate protection and Wilmington Trust is found to be entitled to any priority claim under section 507 of the Bankruptcy Code or otherwise, any such priority claim shall in all events be junior and subordinate in right of the Full Payment of all of the Pre-Petition Obligations and all of the DIP Obligations.   In no event shall Debtors make any payments on account of the Wilmington Trust Claims in violation of the Intercreditor Agreement or without further order of the Court.  Notwithstanding the foregoing provisions of this paragraph 8(f) or anything to the contrary in the DIP Financing Documents, the Wilmington Trust Replacement Liens shall be subordinate to the Carve-Out (as defined below) as and to the extent set forth in paragraph 10.

9.    Fees and Expenses of Professionals.  For so long as no Event of Default under the DIP Loan Agreement shall have occurred and be continuing, the Debtors are authorized to use proceeds of the DIP Loans (but, prior to Full Payment of the Pre-Petition Obligations and DIP

-21-

Obligations, not Cash Collateral without the prior written consent of Senior Lenders) to pay the fees and disbursements (collectively, "*Professional Expenses*") of professionals (including attorneys, accountants, appraisers, consultants, financial advisors, and investment bankers) retained by the Debtors (the "*Debtor Professionals*") or the Committee (the "*Committee Professionals*;" the Debtor Professionals and the Committee Professionals are collectively referred to as the "*Professionals*"), to the extent that such fees and disbursements are approved by the Court; provided, however, that no proceeds of the DIP Loans or any Collateral shall be used to pay the Professional Expenses of any Professionals or any other costs incurred in connection with (a) commencing or continuing any claims, causes of actions, or contested matters against the Pre-Petition Lender or the DIP Lender, including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (b) preventing, hindering or delaying performance or enforcement by the Senior Lenders of their rights or remedies under this Order, any of the DIP Financing Documents, any of the Pre-Petition Loan Documents, or any other agreement between any Debtor and any Senior Lender; (c) challenging any liens or claims of any of the Senior Lenders, including, without limitation, the Pre-Petition Lender Liens, the DIP Liens, Pre-Petition Lender Replacement Liens (collectively, the "*Senior Lender Liens*"), or the DIP Superpriority Claim; or (d) any other purpose prohibited by the DIP Financing Documents (collectively, the "*Prohibited Purposes*"). Notwithstanding the foregoing, the DIP Loans may be used to pay up to $20,000 of the Professional Expenses of the Committee Professionals incurred in connection with the Committee's review during the pendency of the Chapter 11 Cases of the validity, perfection, priority, or amount of the Pre-Petition Obligations, the Pre-Petition Lender Liens, and the Pre-Petition Loan Documents.

YCST01:11148888.4
070206.1001

10. <u>Carve-Out</u>.

(a)     The Senior Lender Liens, the DIP Superpriority Claim, the Pre-Petition Replacement Liens, the Wilmington Trust Replacement Liens, and any priority claims in favor of Wilmington Trust, shall be subject and subordinate to the payment of the following (to the extent that there are not sufficient, unencumbered funds in the respective estates of the Debtors to pay such amounts at the time payment is required to be made):  (i) all unpaid Professional Expenses of Professionals, to the extent incurred prior to or after the occurrence of a Carve-Out Event (as defined below) (excluding any portion of Professional Expenses payable to BMO Capital Markets, as the Debtors' investment banker, as a "transaction fee" in connection with the closing of any sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code), but only to the extent that such Professional Expenses are allowed and payable by order of the Court under sections 328, 330, and/or 331 of the Bankruptcy Code or any interim compensation order, are incurred in accordance with the Budget, and do not exceed in aggregate $250,000; and (ii) accrued and unpaid quarterly fees to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (the "*U.S. Trustee Fees*") (clauses (i) and (ii) being collectively called the "*Carve-Out*").  No amounts received pursuant to the Carve-Out shall be used for any Prohibited Purposes. The term "*Carve-Out Event*" shall mean the termination of the DIP Facility (and Commitment thereunder) on the Commitment Termination Date, whether such termination results from any action of the DIP Lender or any Debtor, expiration of the DIP Term, or otherwise.

(b)     In conjunction with the initial Advance under the Post-Petition Loan an escrow deposit shall be made with DIP Lender's counsel to create a Reserve referred to as the "Professional Expense Reserve" in an amount equal to the Carve Out, which amount shall not be less than $250,000. In addition, no later than Wednesday of each week, the weekly amount

budgeted as Professional Expenses for the prior week shall be deposited into the Professional Expense Reserve. Weekly deposits made into the Professional Expense Reserve shall be utilized to pay billed Professional Expenses for services rendered prior to any Commitment Termination Date, with amounts due paid to Professional Persons, in such proportions and not to exceed the amounts set forth in the Budget, as soon as appropriate orders approving payment are issued by the Bankruptcy Court. The Carve Out shall remain in the Professional Expense Reserve and be utilized for Professional Expenses billed after any Commitment Termination Date, with such amount utilized to pay subsequently billed Professional Expenses. Disbursements of the Carve Out shall only be made from the Professional Expense Reserve to the extent payments would otherwise be due for Professional Expenses had the Commitment Termination Date not occurred; provided, however, that to the extent appropriate Budget adjustments are not made after the Commitment Termination Date, such event shall not prevent payment of Professional Expenses reasonably incurred. In any event, the Carve Out shall be utilized only for Professional Expenses, shall not be subject to the DIP Lender's Liens, and shall be available for payment of any Professional Expenses arising after a Commitment Termination Date. Any excess remaining in the Professional Expense Reserve after payment of all Professional Expenses approved by the Bankruptcy Court in the Chapter 11 Cases and all United States Trustee's fees shall be remitted to Lender to the extent the Obligations have not been paid in full and otherwise as directed by the Bankruptcy Court.. All DIP Loans funded to the Professional Expense Reserve, together with any authorized use of Cash Collateral to pay any of the Carve-Out, may be made or used without the DIP Lender's being deemed to have waived any Event of Default and regardless of whether the Commitment Termination Date has occurred; shall be entitled to all of the benefits and security of the DIP Financing Documents and this Order; and shall reduce the amount of the Carve-Out on a dollar-for-dollar basis. Both the Professional Expense Reserve and all balances

therein shall be held to pay the fees and expenses covered by the Carve-Out; and shall be applied first to satisfy allowed Professional Expenses and U.S. Trustee Fees that are covered by the Carve-Out, then to pay or cash collateralize any unpaid DIP Obligations or Pre-Petition Obligations (in each case, whether or not then due or payable) until Full Payment thereof; then to satisfy any other unpaid administrative expenses of the Debtors' respective estates.

(c) Notwithstanding the Full Payment of the Pre-Petition Obligations and the DIP Obligations, in no event shall the Debtors be authorized to use any proceeds of the DIP Loans or Cash Collateral to pay any claim of any creditor or other party in interest until all Professional Expenses and other administrative claims in the Chapter 11 Cases have been paid in full to the extent provided by this or any subsequent order of the Court.

11. <u>Section 506(c) Claims</u>. The Motion requests inclusion of a provision that the Senior Lenders are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver will be without prejudice to the contention of the DIP Lender that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code); therefore, if granted by the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against the DIP Lender, the Pre-Petition Lender, or any of their respective claims or the Collateral (including, without limitation, the Pre-Petition Collateral) pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by the Senior Lenders. Such waiver shall be addressed by, and subject to, the Final Order.

12. <u>Joint and Several Liability</u>. The Debtors shall be jointly and severally liable to repay the DIP Obligations in accordance with the DIP Financing Documents and, in the case of

YCST01:11148888.4                                                                 070206.1001

Bank Product Obligations, in accordance with the instruments and agreements governing such Bank Product Obligations. The DIP Obligations shall be due and payable, and shall be paid, without offset or counterclaim. Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or alleged to be owed, by any Senior Lender to any Debtor or any of such Debtor's subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the Senior Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the Senior Lenders.

      13.    <u>Preservation of Rights Granted Under this Order</u>.

      (a)    <u>Protection From Other Financing Orders</u>. It shall be an Event of Default under the DIP Loan if an order is entered in any Chapter 11 Case or in any Successor Cases that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is (i) secured by a security, mortgage, collateral interest, or other lien on all or any part of the Collateral that is equal or senior to any of the Senior Lender Liens, or (ii) entitled to priority administrative status that is equal or senior to the DIP Superpriority Claim granted to DIP Lender herein; <u>provided</u>, <u>however</u>, that nothing herein shall prevent the entry of an order that specifically conditions the granting of the benefits of clauses (i) or (ii) above upon Full Payment of the DIP Obligations from the first cash proceeds of such credit or indebtedness. In addition, if there is entered in any Chapter 11 Case or in any Successor Cases any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is secured by a security, mortgage, collateral interest, or other lien on all or any part of the Collateral and each such interest or lien is not junior in priority to all of the Senior Lender Liens, and the terms of such credit (including, without limitation, terms of repayment) are not acceptable to the Senior Lenders, in each case pursuant to intercreditor and other documentation suitable to the Senior Lenders, in their discretion, the entry of any such order

-26-

shall be an event of default under the DIP Facility and the DIP Lender shall be entitled to all rights and remedies available to it under the DIP Financing Documents.

(b)     Rights Upon Dismissal, Conversion or Consolidation.   If any of the Chapter 11 Cases or Successor Cases is dismissed, converted, or substantively consolidated with another case, then neither the entry of this Order nor the dismissal, conversion, or substantive consolidation of any such Chapter 11 Case or Successor Case shall affect the rights or remedies of the DIP Lender under the DIP Financing Documents, or the rights or remedies of the Senior Lenders under this Order, and all of the respective rights and remedies thereunder and hereunder of the Senior Lenders shall remain in full force and effect as if such Chapter 11 Case or Successor Case had not been dismissed, converted, or substantively consolidated.   It shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases or Successor Cases.

(c)     Survival of Order.   The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation or converting any of the Chapter 11 Cases from chapter 11 to chapter 7.

(d)     No Discharge; Credit Bid Rights.   The Motion requests inclusion of a provision that the DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization or liquidation in the Chapter 11 Cases or Successor Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, each Debtor has waived such discharge. The Motion further requests that no plan of reorganization or liquidation, nor any order entered in connection with a sale of assets under section 363 of the Bankruptcy Code, shall be effective to limit or otherwise restrict the right of the Pre-Petition Lender or the DIP Lender to submit a

credit bid for all or any part of the Collateral. Such discharge and credit bid rights provisions shall be addressed by, and subject to, the Final Order.

(e) <u>No Marshaling</u>. In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any Collateral securing any of the DIP Obligations, and in no event shall any Senior Lender Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of any Debtor's estate pursuant to section 551 of the Bankruptcy Code.

(f) <u>No Requirement to File Proof of Claim</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under section 503(b) of the Bankruptcy Code, the DIP Lender shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Agreement and the other DIP Financing Documents without the necessity of filing any such proof of claim, and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Financing Documents or prejudice or otherwise adversely affect the DIP Lender's rights, remedies, powers, or privileges under the DIP Financing Documents or this Order.

(g) <u>Reservation of Certain Rights</u>. Nothing in this Order shall be deemed to be a waiver by the Senior Lenders of their right to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the conversion or dismissal of the Chapter 11 Cases, or to request any other relief in these Chapter 11 Cases or the Successor Cases. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or

any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Order.

14. <u>Automatic Perfection of Liens</u>. The DIP Liens and the Pre-Petition Lender Replacement Liens granted with respect to the Collateral of the Debtors (as well as those non-Debtor affiliates in respect of which an order for relief may hereafter be entered) shall be deemed legal, valid, binding, enforceable, and perfected upon entry of this Order. The Senior Lenders shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document or take any other action (including possession of any of the Collateral) to validate the perfection of any DIP Liens or Pre-Petition Lender Replacement Liens with respect to the Debtors. If the Senior Lenders shall, in their discretion, choose to file or record any such mortgages, deeds of trust, security deeds, notices of lien, or UCC-1 financing statements, or take any other action to validate the perfection of any part of the DIP Liens or the Pre-Petition Lender Replacement Liens, the Debtors and their respective officers are directed to execute any documents or instruments (including, without limitation, amendments to Pre-Petition Date mortgages or other security documents) as the Senior Lenders shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order. Each of the Senior Lenders may, in its discretion, file a certified copy of this Order in any filing office in any jurisdiction in which any Debtor is organized or has or maintains any Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording.

15. <u>Reimbursement of Expenses</u>. All reasonable costs and expenses incurred by the Senior Lenders in connection with (a) the negotiation and drafting of the DIP Financing Documents (or any amendments thereto), (b) the preservation, perfection, protection, and

enforcement of the Senior Lenders' respective rights hereunder or under the DIP Financing Documents, (c) the collection of the DIP Obligations or Pre-Petition Obligations, or (d) the monitoring of the Chapter 11 Cases or Successor Cases, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers, and other professionals incurred by the Senior Lenders in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations or Pre-Petition Obligations, and shall be paid by the Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Financing Documents or the Pre-Petition Loan Documents, as applicable; provided, however, that any time that the Senior Lenders, or their professionals, seek payment of any of the foregoing fees and expenses from the Debtors, each professional of a Senior Lender shall provide copies of its fee and expense statements to counsel for the Committee and the United States Trustee contemporaneously with the delivery of such fee and expense statements to counsel for the Debtors, and the Committee and the United States Trustee shall have fourteen (14) days to object to such fee and expense statements. In no event shall any statement submitted by the Senior Lenders or their professionals to the Debtors, the Committee, the United States Trustee, or any other interested person (or any of their respective professionals), with respect to fees or expenses incurred for any professional retained by the Senior Lenders operate to waive the attorney/client privilege, the work-product doctrine, or any other evidentiary privilege or protection recognized under applicable law.

16. <u>Amendments to DIP Financing Documents</u>. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents and without further order of the Court, any amendments to and modifications of any of the DIP Financing Documents on the following conditions: (i) the amendment or modification must not

-30-

constitute a material change to the terms of the DIP Financing Documents, (ii) copies of the amendment or modification must be served upon counsel for the Committee, the U.S. Trustee, and other interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with the Court. For purposes hereof, a "material change" shall mean an amendment that operates to shorten the term of the DIP Facility; shorten the maturity of the DIP Obligations; increase the aggregate amount of the commitment under the DIP Facility; increase the rate of interest other than as currently provided in or contemplated by the DIP Financing Documents; add new Events of Default; or enlarge the nature and extent of default remedies available to the DIP Lender, following the occurrence of an Event of Default.

17. <u>Events of Default; Remedies.</u>

(a) <u>Events of Default and Remedies</u>. Upon or after the occurrence of an Event of Default under the DIP Loan Agreement, the DIP Lender shall be fully authorized, in its sole discretion, to terminate further advances under the DIP Facility, demand payment of all DIP Obligations, terminate further use of any corporate creditor debit cards, and hold and apply any balances in any accounts of the Debtors to the payment or cash securitization of any of the DIP Obligations; and, upon five (5) Business Days' prior written notice to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee, the Senior Lenders may, upon expiration of the notice period (the "*Remedies Notice Period*") set forth above (unless the Court determines by order entered during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing), enforce all of the Senior Lender Liens with respect to any or all of the Collateral; take all other actions and exercise all other remedies under the DIP Financing Documents, the Pre-Petition Loan Documents, and applicable law that may be necessary or be deemed appropriate by the Senior Lenders to collect any of the DIP Obligations and the Pre-Petition Obligations; proceed against, or realize upon all or any portion of the

Collateral as if the Chapter 11 Cases or any Successor Cases were not pending; and otherwise enforce any of the provisions of this Order. Notwithstanding anything to the contrary, during the Remedies Notice Period (but not thereafter without Senior Lenders' written consent), the Debtors may, for so long as the Debtors remain current in submitting Borrowing Base Certificates and no Overadvance exists or would result therefrom, use Cash Collateral to pay payroll and other expenses critical to the businesses of the Debtors operating in accordance with the Budget.

(b) <u>Application of Collateral Proceeds</u>. Notwithstanding any contrary provision contained in this Order (including, without limitation, any contrary provision contained in paragraph 8 of this Order), if the Senior Lenders shall proceed to enforce the Senior Lender Liens upon any Collateral, then the Senior Lenders may, in their discretion, elect to apply proceeds of the Collateral (including, without limitation, proceeds of the Pre-Petition Collateral) to the payment of the DIP Obligations and the Pre-Petition Obligations, in such order of application as the Senior Lenders may elect in their discretion.

(c) <u>Rights Cumulative</u>. The rights, remedies, powers, and privileges conferred upon the Senior Lenders pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Financing Documents and the Pre-Petition Loan Documents.

18. <u>Monitoring of Collateral</u>.

(a) <u>Inspection Rights</u>. Representatives of the Senior Lenders shall be authorized to visit the business premises of each Debtor to (i) inspect any Collateral or other assets, (ii) inspect and make copies of any books and records of the Debtors, and (iii) verify or obtain supporting details concerning the financial information to be provided to the Senior Lenders hereunder or under any of the DIP Financing Documents or Pre-Petition Loan Documents, all as permitted by the DIP Financing Documents and the Pre-Petition Loan Documents.

YCST01:11148888.4  070206.1001

(b)     <u>Right to Retain Professionals</u>. The Senior Lenders shall be authorized to retain attorneys, appraisers, consultants and financial advisors, at the Debtors' expense, which attorneys, appraisers, consultants, and advisors shall be afforded reasonable access to the Collateral and each Debtor's business premises and records, during normal business hours, for purposes of monitoring the business of the Debtors, verifying each Debtor's compliance with the terms of the DIP Financing Documents, this Order and the Pre-Petition Loan Documents, and appraising all or any part of the Collateral.

19.     <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified and lifted as to the Senior Lenders to the extent necessary to implement the provisions of this Order and the DIP Financing Documents, thereby permitting the Senior Lenders, among other things, to receive collections of Collateral for application to the Pre-Petition Obligations and the DIP Obligations, and to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds, and other instruments and documents evidencing or validating the perfection of the DIP Liens and the Pre-Petition Lender Replacement Liens, and to enforce any of the Senior Lender Liens as and to the extent authorized by this Order.

20.     <u>Effect of Appeal</u>. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

(a)     such stay, modification, or vacation shall not affect the validity of any obligation, indebtedness, or liability incurred or liens granted by any Debtor to the Senior Lenders prior to the effective date of such stay, modification, or vacatur, or the validity, enforceability, or priority of any liens, rights, or claims authorized, created, or continued in effect under the original provisions of this Order or pursuant to the DIP Financing Documents; and

YCST01:11148888.4                                                                070206.1001

(b)　any indebtedness, obligation, or liability incurred by any Debtor to the DIP Lender under the DIP Financing Documents prior to the effective date of such stay, modification, or vacatur shall be governed in all respects by the original provisions of this Order and the DIP Financing Documents, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits, including the DIP Liens and the priorities granted herein and pursuant to the DIP Financing Documents, with respect to any such indebtedness, obligation, or liability. All advances under the DIP Facility pursuant to the DIP Financing Documents are deemed to have been made in reliance upon this Order, and, therefore, the indebtedness resulting from such DIP Facility prior to the effective date of any stay, modification, or vacatur of this Order cannot, as a result of any subsequent order in these Chapter 11 Cases or any Successor Cases, (i) be subordinated or (ii) be deprived of the benefit or priority of the DIP Liens and the DIP Superpriority Claim granted to the DIP Lender under this Order or the DIP Financing Documents.

21.　<u>Deadline for Challenge to Pre-Petition Lender Liens and Claims</u>.　The Stipulations shall be conclusive and binding upon the Debtors, but shall be subject to the right of an interested party (other than the Debtors) having standing to do so to commence an appropriate adversary proceeding or contested matter objecting to the validity or amount of the Pre-Petition Obligations or the validity, extent, perfection, priority, or non-avoidability of the liens and security interests of the Pre-Petition Lender (for itself) in the Pre-Petition Collateral or seeking disgorgement of all or part of the payment of the Pre-Petition Obligations, which adversary proceeding or contested matter must be filed no later than the soonest to occur of (a) 75 days after the Petition Date, and (b) 65 days after the appointment of a Committee. If such adversary proceeding or contested matter is not timely filed, then (i) the liens and security interests of the Pre-Petition Lender (for itself) in the Pre-Petition Collateral shall be deemed

legal, valid, binding, enforceable, perfected, and non-avoidable, (ii) all of the Pre-Petition

Obligations shall be conclusive and binding upon all parties in interest in the Chapter 11 Cases

and in any Successor Cases, including, without limitation, any subsequently appointed trustee, as

legal, valid, binding, enforceable claims that are not subject to offset, counterclaim,

equitable subordination, recharacterization, or other defense or claim, and (iii) all of the

Stipulations shall be deemed findings of fact and conclusions of law by this Court.

22.     No Deemed Control.  The Motion requests inclusion of a provision that the Senior

Lenders shall not be deemed to be in control of the Debtors or their operations or to be acting as

a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in

the United States Comprehensive Environmental Response, Compensation and Liability Act, as

amended, or any similar state or federal statute) with respect to the operation or management of

any Debtor merely by consenting to this Order, making advances under the DIP Facility, or

administering the financing relationship with the Debtors pursuant to the DIP Financing

Documents.  Such control provisions shall be addressed by, and subject to, the Final Order.

23.     Binding Effect; Successors and Assigns.  The provisions of this Order shall be

binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the

Senior Lenders, the Debtors, and their respective successors and assigns (including any chapter

11 trustee hereafter appointed for the estate of any Debtor or any chapter 7 trustee appointed or

elected in a superseding chapter 7 case), and shall inure to the benefit of the Senior Lenders and

their respective successors and assigns.  In no event shall the DIP Lender have any obligation to

make any advances under the DIP Facility to any chapter 7 or chapter 11 trustee appointed or

elected for the estate of any Debtor.

24.     No Third Party Rights.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

25.     Immediate Effectiveness.  This Order shall be valid, take full effect, and be enforceable immediately upon entry hereof notwithstanding any contrary Bankruptcy Rule or Rule of Civil Procedure and there shall be no stay of execution or effectiveness of this Order.

26.     Order Controls.  To the extent that any provisions in the DIP Loan Agreement are inconsistent with any of the provisions of this Order, the provisions of this Order shall govern and control.  Moreover, notwithstanding section 510 of the Bankruptcy Code, to the extent the priorities or any other provisions set forth in any pre-petition indenture or other agreement to which the Senior Lenders are party or by which they may be bound are inconsistent with the priorities or any other provisions set forth herein, the priorities in, and provisions of, this Order shall govern and control and shall be binding on all parties herein and parties bound by such indentures or agreements.

27.     Retention of Jurisdiction.  This Court has and shall retain jurisdiction to enforce this Order according to its terms.

28.     **Final Hearing.**  The Final Hearing to consider entry of the Final Order and final approval of the Senior DIP Facility shall be held at _10:00_ o'clock _a_.m. on _June 24_, 2011, in the courtroom of Judge _Carey_, courtroom _5_, United States Bankruptcy Court for the District of Delaware.  On or before _June 10_, 2011, the Debtor shall serve, by United States mail, first class postage prepaid, notice of the entry of this Order and of the Final Hearing (the "*Final Hearing Notice*"), together with copies of this Order and the Motion on (a) the parties given notice of the Interim Hearing, and (b) any party who has filed prior to such date a request for notices with this Court.  The Final

-36-

Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than ___June 17___, 2011 at 4:00 p.m. prevailing Eastern time, which objection shall be served so as to be received on or before such date by: (a) counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391, Attention: Robert Brady, Esq.; (b) counsel for the Senior Lenders, Law Offices of Joseph J. Bodnar, 2101 North Harrison Street, P.O. Box 1022, Wilmington, DE 19899-1022, Attention: Joseph J. Bodnar, Esq. and Nexsen Pruet, LLC, 1230 Main Street, Suite 700, (29201), P.O. Drawer 2426, Columbia, South Carolina 29202, Attention: Julio E. Mendoza, Jr., Esq. Unless an objecting party shall appear at the Final Hearing to assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

29. _Nunc Pro Tunc Effect of this Order_. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable _nunc pro tunc_ to the Petition Date immediately upon execution thereof.

30. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: Wilmington, Delaware
        June 10, 2011

Brendan L. Shannon
United States Bankruptcy Judge