## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLEN FAMILY FOODS, INC., *et al.*,[1] | Case No. 11-11764 (KJC) |
| Debtors. | Jointly Administered |

Objection Deadline for Bidding Procedures: June 17, 2011 at 4:00 p.m. (ET)
Hearing Date for Bidding Procedures: June 24, 2011 at 10:00 a.m. (ET)
Objection Deadline for Sale Motion: TBD
Hearing Date for Sale Motion: TBD

**DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BID PROCEDURES IN CONNECTION SALE OF SUBSTANTIALLY ALL OF THE DEBTORS; ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT PROVISIONS; (B)(I) AUTHORIZING AND APPROVING SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF**

Allen Family Foods, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), through their undersigned counsel, submit this motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders approving, among other things, bidding procedures and the sale of the Debtors' assets ("Motion"). In support of this Motion, the Debtors respectfully represent:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's tax identification number, are: Allen Family Foods, Inc. (7949), Allen's Hatchery, Inc. (8943), and JCR Enterprises, Inc. (8322). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 126 N. Shipley Street, Seaford, DE 19973.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

2.      On June 9, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.  No trustee, examiner or official committee of unsecured creditors has been appointed in these cases.

4.      Information regarding the Debtors' history and business operations, their capital structure and primary secured indebtedness, and the events leading up to the commencement of these chapter 11 cases (the "Chapter 11 Cases") can be found in the *Declaration of Brian Hildreth in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is incorporated herein by reference.

**A.      Debtors' Decision to Sell the Purchased Assets**

5.      A variety of external economic factors have led to a decline in the Debtors' operating performance.  The Debtors believe that the leading adverse factor has been a steady and significant rise in the cost of feed ingredients used by the Debtors since 2008.  Both during and following the economic downturn, the cost of corn and other feed ingredients has risen to record levels, and the combination of unsustainable ingredient costs and reduced finished

2

poultry prices has directly led to the Company's financial woes. Indeed, in the last twelve months alone, the average price of a bushel of corn has increased 82% from its historical average, rising from $3.65 per bushel to nearly $6.70 per bushel in March 2011. In more tangible terms, the Debtors' estimate that every $1 increase in corn prices represents $10 million in additional annual expenses to the Company.

6. Additionally, the Debtors' performance has been impacted by increases in energy and gas costs that continue to rise and fluctuate in an unpredictable manner. As a consequence of these sustained higher costs, the Debtors have implemented a bevy of operational initiatives designed to respond to the decline in poultry product prices, the over-saturation in the industry, and the new demands of the Company's customer base. However, despite the Debtors' affirmative initiatives implemented to combat these external challenges during this transitional period, the Debtors' operating costs have continued to climb faster than the Debtors can adjust their business practices, and consequently, these costs have negatively impacted the Debtors' performance. In sum, despite the staffing reductions, volume reductions, eliminated management benefits, and customer price increases, these issues have significantly hampered the Debtors' ability to service their non-trade-related debt and caused a current liquidity strain.

7. In recent months, the Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. These efforts have included sharing information and engaging in discussions with the Debtors' secured lenders and stakeholders with the goal of consensually restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt-servicing capabilities. In November 2010, the Debtors retained BMO Capital Markets ("BMO") to investigate the Debtors' operations and market their assets to viable parties who were potentially interested in purchasing

3

the Company as a going-concern business. BMO spent significant time with the management team developing, among other things, a full operating and integrated cash flow model, confidential information memorandum, electronic data site and management presentation.

8.    BMO initiated the sale process by contacting twenty-two (22) parties and requesting indications of interest by late March, 2011. Out of the 22 contacted parties, fourteen (14) requested and were sent a confidential information memorandum, and three (3) parties submitted initial bids and were selected to continue with in-depth diligence on the Company. Only one party—Seaford Milling Company ("Seaford"), an affiliate of an established poultry industry participant, Mountaire Farms—submitted a final, non-binding letter of intent (the "LOI"), which the Debtors received on May 3, 2011.

9.    After the Debtors received the LOI, the parties began to negotiate the terms of an asset purchase agreement. In addition, the Debtors opened a dialogue with the MidAtlantic Farm Credit, ACA, an agricultural credit association, on its own behalf and as agent/nominee for a consortium of other lending institutions ("MAFC")[2] and Manufacturers and

---

[2]    Pursuant to (i) that certain Second Amended and Restated Step Down Credit Agreement dated January 13, 2010, as amended by a First Amendment to Second Amended and Restated Step Down Credit Agreement dated June 25, 2010, and as further amended by a Second Amendment to Second Amended and Restated Step Down Credit Agreement and Forbearance Agreement dated April 8, 2011 (collectively, the "Term Loan Agreement") and (ii) that certain Second Amended and Restated Promissory Note dated as of June 25, 2010, as modified on April 8, 2011 (collectively, the "Term Loan Note"), the Debtors entered into a secured credit facility (the "Term Loan Facility") in the original principal amount of $25 million. Further, pursuant to (i) that certain Second Amended and Restated Prepay and Working Capital Revolving Credit Agreement dated January 13, 2010, as amended by that certain First Amendment to Second Amended and Restated Prepay and Working Capital Revolving Credit Agreement dated June 25, 2010, and as further amended by that certain Second Amendment to Second Amended and Restated Prepay and Working Capital Revolving Credit Agreement and Forbearance Agreement dated April 8, 2011 (collectively, the "RLOC Agreement" and together with the Term Loan Agreement, collectively, the "MAFC Loan Agreements") and (ii) that certain Working Capital Revolving Promissory Note dated as of June 25, 2010, as modified on April 8, 2011 (collectively, the "RLOC Note, " and together with the Term Loan Note, the "Notes" and together with the Term Loan Note, collectively, the "Notes"), the Debtors entered into a revolving letter of credit facility (the "RLOC Facility") in the maximum principal amount of $55 million. On May 20, 2011, the lenders under the RLOC Facility made a protective advance in the amount of $2,146,880.99, and on June 2, 2011, the lenders made a second protective advance in the amount of $2,275,426.95 (together, the "Protective Advances") to AHI under, and pursuant to the provisions of, the RLOC for the purposes of preserving certain perishable collateral. The Debtors' obligations under the MAFC Loan Agreements were scheduled to mature on June 1, 2011. However,

070206.1001

Traders Trust Company, as successor by merger to Wilmington Trust Company, the lender under their revolving credit note facility ("M&T,"[3] and together with the MAFC, the "Pre-Petition Lenders") regarding the need for covenant and other relief under the Term Loan Facility, RLOC Facility, and WTC Note.

10.     The Debtors believe that their proposed going-concern sale of their businesses and assets through these Chapter 11 Cases, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers, is the surest way to (i) allow the Debtors to maintain liquidity and ensure the continuity of the Debtors' operations, (ii) avoid significant deterioration in the value of the Debtors' assets that would likely occur absent the expeditious consummation of a sale, and (iii) maximize recoveries to creditors.  Indeed, the Debtors' businesses are of a type that cannot endure a prolonged stay in chapter 11 without significant risk to the Debtors' survival.  Accordingly, a prompt sale is essential to a successful result in these cases.

**B.     The Asset Purchase Agreement**

11.     Following extensive discussions and negotiations, the Debtors and Seaford agreed to the terms of the Asset Purchase Agreement, attached hereto as Exhibit A (the "APA"), for the purchase of a portion of the properties owned by the Debtors and used in their business (the "Target Assets"), while excluding certain other valuable assets of the Debtors, such as 24

---

on June 1, 2011, the Debtors executed a forbearance agreement with MAFC regarding various default conditions under the terms of the Loan Agreements, including the date of maturity.

Additionally, MAFC, along with a group of affiliated lenders (collectively, the "DIP Lenders") have provided the Debtors with a $22 million new money debtor-in-possession financing facility (the "DIP Facility"), pursuant to the terms of that debtor-in-possession financing facility dated as of June 9, 2011.

[3]     Pursuant to a Revolving Credit Note (the "WTC Note") and Credit Agreement dated December 19, 2001 (as subsequently amended, the "WTC Credit Agreement") in the initial amount of $20,000,000, which were recently amended on August 10, 2010, the current maximum principal amount owed under the WTC Note is $2,500,000. M&T issued a default notice to the Debtors under the WTC Note and WTC Credit Agreement on March 25, 2011, and on May 27, 2011, M&T indicated its intent to cancel the Debtors' account and immediately demand payment in full in accordance with its demand letter.

broiler growout farms (the "Growout Farms"), and approximately 3,437 acres of farmland (the "Farmland"). To obtain the maximum value for the Target Assets, the Debtors propose to subject the sale of the Target Assets to an auction process with the APA serving as a basis for all future bids. In connection with the auction process, the Debtors have agreed to grant Seaford certain bidding protections, with this Court's approval, including an expense reimbursement not to exceed $600,000 (the "Expense Reimbursement"), and a break-up fee in the amount of an additional $2,625,000 (the "Break-Up Fee") in the event an Alternative Transaction (as defined in the APA) is closed or consummated.

12. If no other bids are received for the Target Assets that are higher or otherwise better than the transaction set forth in the APA, the Debtors intend to sell the Target Assets to Seaford pursuant to the terms of the APA.

13. The significant terms of the APA are:[4]

(a) Target Assets: Pursuant to Section 1.1, Target Assets include all of the Debtors' assets, properties and business of every kind and description and wherever situated (including any causes of action arising under chapter 5 of the Bankruptcy Code against any vendor, supplier, or customer of the Target Business or any party to an Assigned Contract), excepting only those assets set forth (and to the extent therein specified) on the *Schedule of Excluded Assets* annexed to the APA as **Schedule 1.1**.

(b) Excluded Assets: Pursuant to Schedule 1.1, notwithstanding anything to the contrary in the APA, Seaford shall not acquire the following assets of the Debtors pursuant to the APA:

(i) 24 broiler growout farms (the "Growout Farms");

(ii) Approximately 3,437 acres of farmland (the "Farmland");

(iii) Accounts receivables;

---

[4] The following is a summary of the terms set forth in the APA annexed hereto as Exhibit A. Capitalized terms used but not defined in this section have the meanings given to them in the APA. To the extent that this summary differs in any way from the terms set forth in the APA, the terms of the APA shall control.

(iv)  Prepaid expenses;

(v)  Life insurance policies and cash surrender value;

(vi)  Unamortized loan costs;

(vii)  All tax refunds; and

(viii)  All machinery, equipment, tools, molds, motor vehicles, trailers, transportation, packing and delivery equipment, supplies, furniture and fixtures located at and used in connection with the Company Farms.

(c)  <u>Consideration</u>:  Pursuant to <u>Section 2.1</u>, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid for the purchase of the Purchased Assets shall be an initial amount of Thirty Million Dollars ($30,000,000) (the "<u>Base Purchase Price</u>") plus an additional Final Inventory Amount[5] as defined and calculated pursuant to <u>Section 2.3</u> of the APA (collectively the "<u>Purchase Price</u>").

In addition to the foregoing consideration, as consideration for the grant, sale, assignment, transfer and delivery of the Purchased Assets, Seaford shall assume and discharge the Assumed Liabilities (described below). See <u>Section 1.2</u> of the APA.

(d)  <u>Assumed Liabilities</u>:  Pursuant to <u>Section 1.2</u> of the APA, on the terms and subject to the conditions set forth in the APA and the Sale Order, Seaford shall assume all of the Debtors' obligations on account of amounts due to contract growers under existing contracts for the growing of live bird inventories acquired.

(e)  <u>Excluded Liabilities</u>:  Pursuant to <u>Section 1.3</u> of the APA, Seaford shall not assume any liabilities of the Seller other than the Assumed Liabilities, and, with respect to each of the Assumed Liabilities, Seaford does not assume and shall not have or be under any liability or obligation over and above any amount, or after the occurrence of any limitation or expiration date, of such liability or obligation stated on <u>Schedule 1.2 to the APA</u>.  Without limiting the generality of the foregoing and except as may be otherwise provided on <u>Schedule 1.2</u>, the Assumed Liabilities will not include, and Seaford shall not assume under the APA, any of the following obligations or liabilities of the Seller:

(i)  Any cost, expense, or liability (whether tax-related or otherwise) of the Seller resulting from or arising out of the transactions contemplated by the APA;

---

[5]      The aggregate value of the inventory items calculated in accordance with <u>Section 2.3(i)</u> through <u>(xiv)</u> of the APA shall constitute the Final Inventory Amount, but in no event shall exceed thirty-eight million dollars ($38,000,000).

(ii)     Any debt, obligation, or liability to any employee, agent, officer, director, or security holder of the Seller or of any entity owned or controlled in whole or in part by the Seller under any employment agreement, sales agreement, representation agreement, employee stock option plan, stock purchase plan, bonus plan or arrangement, pension plan or other benefit plan, health plan, vacation plan, or other employee welfare plan or arrangement, unless the agreement is specifically identified on Schedule 1.4 to the APA;

(iii)    Any debt, liability, or obligation of the Seller (or costs and expenses in connection therewith) which would otherwise be an Assumed Liability, to the extent that such debt, liability, or obligation is actually satisfied or paid on behalf of the Seller by an insurer or insurers under a policy issued to the Seller;

(iv)    Any liability or obligation arising from any violation by the Seller or by its officers, employees, or agents of any statute (or rule or regulation thereunder), executive regulation of the United States, any state, or any political subdivision or agency thereof;

(v)     Any liability or obligation the existence of which violates or is contrary to any covenant, representation, or warranty of the Seller;

(vi)    Federal and other domestic income tax or other tax or employee withholding liabilities existing or arising from Seller's operation of the Target Business prior to the Closing;

(vii)   Any liability or obligation for or arising under any claim for workers' compensation or for any tort, breach of any legal duty, breach or violation of any contract, or violation or breach of any law, statute, ordinance, rule, regulation, injunction, or decree, or any liability or obligation for any product liability, warranty (express or implied), or other claim connected in any manner with any products, events, or activities of the Target Business produced, taking place, or arising, in whole or in part, prior to the Closing;

(viii)  An y liability of Seller arising out of or in any way relating to or resulting from any product manufactured, assembled, or sold prior to the Closing Date (including, without limitation, any liability of Seller for claims made for injury to person, damage to property, or other damage, whether made in product liability, tort, breach of warranty, or otherwise);

(ix)    Any liability related to any pension plan including the Allen Group Defined Benefit Union Plan and the JCR Enterprises, Inc. Defined Benefit Union Plan;

(x)     Any liability, obligation, or debt resulting from: (a) the Agreement between The Industrial Workers of America DL 4/International Association of Machinists and Aerospace Workers, AFL-CIO and its Local Lodge 43 and JCR Enterprises Inc. effective July 27, 2009; (b) the Agreement between

Allen Family Foods Harbeson Plant and Truck Drivers, Helpers, Taxicab Drivers, Garage Employees, and Airport Employees Local Union No. 355 affiliated with the International Brotherhood of Teamsters, effective February 1, 2009; and (c) Collective Bargaining Agreement between Allen Family Foods Inc. (Harbeson Delaware) and United Food and Commercial Workers Union, Local 27, effective February 1, 2009;

(xi)     Any accounts payable or trade account payable (including, but not limited to, those items designated as Accounts Payable, Accrued Payroll, or Accrued Expense as reflected on the April 30, 2011 financial statements); and

(xii)    Any liability of Seller under any contract that is not an Assigned Contract.

(f)     Transition Services Agreement.  At the Closing, Seller and Purchaser shall enter into a transition services agreement in form and substance agreeable to the parties pursuant to which each party shall agree to provide the other party for a reasonable period of time after the Closing and for reasonable compensation, certain mutually agreeable services necessary, with respect to Purchaser, for the transition of the Target Assets from the Seller to Purchaser and, with respect to Seller, for the ongoing administration of the Bankruptcy Case.

(g)     Employees:  Pursuant to Section 6.7.2 of the APA, Purchaser is not obligated to hire any Active Employee but may interview or review all Active Employees. Purchaser will provide Seller with a list of Active Employees to whom Purchaser will make an offer of employment (the "Hired Active Employees").  Subject to legal requirements, Purchaser will have reasonable access to the Target Assets and personnel records (including performance appraisals, disciplinary actions, grievances and medical records) of Seller for the purpose of preparing for and conducting employment interviews with all Active Employees and will conduct a review as expeditiously as possible prior to the Closing Date.

(h)     Expense Reimbursement and Break-Up Fee:  Pursuant to Section 6.4.3(e) of the APA, if the APA is terminated pursuant to Section 10 therein, then, subject to Section 10.2, the Purchaser shall be entitled to (i) the Purchaser's reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, HSR Act filing fees, escrow and other fees and expenses) not to exceed $600,000 (the "Expense Reimbursement") and (ii) in the event the Seller sells, transfers, leases or otherwise disposes of, directly or indirectly (including through an asset sale, stock sale, merger, or other similar transaction or pursuant to a plan of reorganization in the Bankruptcy Case) all or substantially all of the Target Business or the Target Assets in a transaction or a series of transactions with one or more persons other than Purchaser in any circumstance, including in accordance with the Bidding Procedures (such event being an "Alternative Transaction") on or prior to the date that is twelve (12) months after the date of such termination, a break-up fee in the amount of an additional $2,625,000 (the "Break-Up Fee") with such amount being payable upon the closing or consummation of such Alternative Transaction; provided, however, that, for the

avoidance of doubt, notwithstanding any provisions of the APA to the contrary, Seller shall not be obligated to pay, and Purchaser shall not be entitled to receive , the Break-Up Fee upon the closing on an Alternative Transaction if (x) Seller terminates the APA pursuant to Section 10.1(f) as a result of Purchaser's breach of the APA; or (y) Purchaser terminates the APA pursuant to Section 10.1(g) as a result of the failure of any one or more of the conditions set forth in Sections 7.1, 7.4, 7.10, 7.11, or 7.12.

(i)     Termination:  Pursuant to Section 10.1, the APA may be terminated as follows:

    (i)      by mutual consent of Purchaser and Seller;

    (ii)     by Purchaser or Seller, upon Seller entering into an agreement providing for an Alternative Transaction, provided that any termination pursuant to Section 10.1(b) shall not become effective until Seller fulfills its obligation to pay any Break-Up Fee and Expense Reimbursement payable pursuant to Section 10.2 (Break-Up Fee; Expense Reimbursement); notwithstanding anything set forth in the APA, Purchaser can only be designated as the Next Highest Bidder in accordance with the Bidding Procedures if Purchaser submits a bid at the Auction other than the bid embodied in the APA.

    (iii)    by Purchaser or Seller in the event the Closing has not occurred (other than through failure of any party seeking to terminate the APA to comply fully with its obligations under the APA) on or before December 31, 2011;

    (iv)    by Seller if, incident to the Bidding Procedures Order, Seller accepts and closes on a competing bid for the purchase of all or part of the Target Assets;

    (v)     by Purchaser if Seller's Bankruptcy Case is converted to one under Chapter 7 of the Bankruptcy Code;

    (vi)    by the non-breaching party upon a material breach of any provision of the APA provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of three (3) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of the APA); or

    (vii)   by the Purchaser if satisfaction of any condition in Article 7 of the APA on or before December 31, 2011 or such later date as the parties may agree upon becomes impossible (other than through the failure of the Purchaser to comply with its obligations under the APA); or by the Seller if satisfaction of any condition in Article 8 of the APA on or before December 31, 2011 becomes impossible (other than through the failure of the Seller to comply with its obligations under the APA).

YCST01:11122684.2     070206.1001

(j)     Books and Records.  Seaford shall make available to the Seller copies of all books, files, documents and records included as part of the Target Assets as the Seller may reasonably request for a period of eighteen (18) months post-Closing. If the Seller desires copies of any of such documents or records, all copying costs shall be borne by the party requesting copies.

(k)     Subject to Court Approval:  The APA is subject to Court approval.

## C.     The Excluded Assets Offered For Sale

14.     In addition to the Target Assets, the Debtors seek authority through this Motion to establish procedures and consummate a sale of the Excluded Assets (as defined in the APA), including, but not limited to, the Growout Farms and the Farmland, to the highest and best bidder for such assets.  Any bids for the sale of the Excluded Assets shall not trigger any obligation to pay any Expense Reimbursement or Break-Up Fee amounts.  The Debtors will encourage parties to submit bids for the purchase of the Target Assets, the Excluded Assets, or both the Target Assets and Excluded Assets (collectively, the "Available Assets") together.

15.     The sale of the Available Assets is subject to this Court's approval and the auction process proposed herein.  The Debtors believe that the sale of the Available Assets will maximize the value of their estates for the benefit of their creditors and other interested parties.

## SUMMARY OF RELIEF REQUESTED[6]

16.     The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, the Court's approval of (i) the sale of the Target Assets pursuant to the APA free and clear of Interests, or the right to consummate a higher or otherwise better offer or transaction (a "Superior Transaction") with an alternative buyer (an "Alternative Purchaser"), as well as the sale of the Excluded Assets pursuant to the highest or otherwise best offer, (ii) the institution of certain bidding, auction and

---

[6]     Capitalized terms in this summary have the meanings given to them in the Motion.

notice procedures for the solicitation and consideration of competing offers for the Available

Assets, including the Expense Reimbursement and Break-Up Fee payable to Seaford

(collectively, the "Bidding Procedures," attached as Schedule 1 to the Bidding Procedures Order

(as defined below)), and (iii) the assumption, assignment and/or transfer of certain executory

contracts to Seaford or, alternatively, to such other Successful Bidder (as defined in the Bidding

Procedures). Under the terms of the APA, the Bidding Procedures Order must be entered by the

Court no later than fifteen (15) days after the Petition Date (which is June 24, 2011) and the Sale

Order (as defined below) must be entered by the Court no later than July 27, 2011.[7]

        17.    More specifically, through this Motion, the Debtors request that the Court

enter the following orders:

(a)    The Bidding Procedures Order: An order (the "Bidding Procedures Order," in
substantially the form attached hereto as Exhibit B) approving (i) the Bidding
Procedures; (ii) the Expense Reimbursement and Break-Up Fee provisions of the
APA; (iii) the notice (the "Notice of Auction and Sale Hearing") establishing the
dates, times, and locations of the deadline to bid on the Available Assets, the
auction of the Available Assets (the "Auction") and the sale hearing for the
Available Assets (the "Sale Hearing") pursuant to the dates proposed in the
Bidding Procedures Order, subject to the Court's availability; and (iv) the notice
(the "Notice of Assumption and Assignment") of the Debtors' intent to assume,
assign and/or transfer to Seaford or, alternatively, to such other Successful Bidder,
the contracts, commitments, leases, licenses, permits, purchase orders, and any
other executory contracts and unexpired leases (collectively, the "Executory
Contracts and Unexpired Leases"), and the corresponding cure amounts required
to be paid in connection with such assumption, assignment and/or transfer.

(b)    The Sale Order: Following the Auction (if any), an order or orders (the "Sale
Order(s)," in substantially the form attached hereto as Exhibit C, as to the
proposed sale of the Target Assets to Seaford) for the approval of (i) the sale of
the Available Assets free and clear of Interests, and (ii) the assumption,
assignment, and/or transfer of the Executory Contracts and Unexpired Leases to

---

[7]    The APA as executed indicates a requirement that the Sale Order be entered forty-five (45) days after the
Petition Date (which is July 24, 2011); given the Court's calendar, Seaford has agreed to amend the APA so that the
deadline runs on July 27. The DIP Facility (as defined below) requires entry of the Bidding Procedures Order and
the Sale Order within 15 days and 48 days, respectively.

Seaford or, alternatively, to such other Successful Bidder under the Bidding Procedures.

18.     The sale of the Debtors' businesses and assets must occur quickly.  The Debtors believe that every day spent in chapter 11 increases the real and palpable risk of business loss and value deterioration.  The Debtors' business is not the type of business that can survive a prolonged stay in chapter 11.  Given the Debtors' obligations to their Pre-Petition Lenders and DIP Lenders, and given the highly competitive nature of the poultry industry, in order to maximize value and ensure a successful result in these cases, the Debtors' submit that a prompt and orderly sale of the Target Assets must occur.  Absent a prompt sale pursuant to the procedures and timelines proposed herein, the Debtors believe that the going concern value of the Target Assets will be significantly compromised, and that their very viability will be at significant risk.

19.     The Debtors expressly reserve the right to modify the relief requested herein, including the proposed Bidding Procedures, prior to or at the applicable hearing.

## BIDDING PROCEDURES AND RELEVANT NOTICES

### A.     Bidding Procedures

20.     The Debtors believe the proposed Bidding Procedures, a copy of which is annexed as Schedule 1 to the Bidding Procedures Order, will maximize the realizable value of the Available Assets for the benefit of the Debtors' estates, creditors and other interested parties. The Bidding Procedures contemplate an auction process pursuant to which bids for any or all of the Available Assets will be subject to higher or otherwise better offers.

21.     The Debtors seek to implement a competitive bidding process designed to maximize recovery for the benefit of their estates.  As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to

participate in the Auction. Specifically, the Bidding Procedures provide, in relevant part, as follows:[8]

(a) <u>Participation Requirements</u>: In order to participate in the bidding process or otherwise be considered for any purpose thereunder, a person interested in the Available Assets (a "<u>Potential Bidder</u>") must first deliver the following materials to the Debtors and their counsel:

    (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel which, in the aggregate, is no less favorable to the Debtors than the confidentiality agreement executed by Seaford in connection with the negotiations over the APA;

    (ii) the most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors that demonstrates the Potential Bidder's financial ability to consummate a contemplated sale transaction and (y) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); <u>provided</u> that if a Potential Bidder is unable to provide Financials, the Debtors may accept such other information sufficient to demonstrate to the Debtors' reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction. A Potential Bidder for the Target Assets also must establish that it has the financial ability to consummate its proposed transaction within the timeframe contemplated for consummation of the APA. A person meeting the requirements set forth in this paragraph and in the Bidding Procedures shall be considered a "<u>Qualified Bidder</u>."

(b) <u>Qualified Bid</u>. The Debtors shall determine whether a bid qualifies as a "<u>Qualified Bid</u>." To constitute a Qualified Bid for some or all of the Target Assets, a bid (other than the APA, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and:

    (i) state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that is substantially similar to the APA (or pursuant to an

---

[8] The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures. Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures. To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

    

alternative structure that the Debtors determine is no less favorable to the Debtors than the terms and condition of the APA) and has been marked to show amendments and modifications to the APA, including price, assets to be purchased, and terms, that are being proposed by the Qualified Bidder, as applicable (a "Marked APA");

(ii)    be an all-cash bid; provided that a bid need not be in cash for any amount in excess of the aggregate amount outstanding under the Term Loan Facility, RLOC Facility, WTC Note, and DIP Facility;

(iii)    equal or exceed the consideration being paid by Seaford pursuant to the APA by $3.575 million, which is the sum of $600,000 (the maximum amount of the Expense Reimbursement); $2,625,000 (the maximum amount of the Break-Up Fee), and $350,000;[9]

(iv)    contain a list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors (which may include some or all of the contracts and leases included in the APA and some or all of the excluded contracts not included in the APA);

(v)    confirm that the offer shall remain open and irrevocable as provided in the Bidding Procedures;

(vi)    enclose a copy of a proposed Marked APA;

(vii)    be accompanied with a certified or bank check or wire transfer in an amount equal to $2 million as a minimum good faith deposit (the "Minimum Deposit"),[10] which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid;

(viii)    be on terms that ar e not materially more burdensome or conditional than the terms of the APA;

(ix)    not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder;

(x)    not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and

---

[9]    To the extent that multiple parties submit bids on portions of the Target Assets, the Debtors will consider such parties Qualified Bidders for purposes of this condition if all such bids for the Target Assets in the aggregate exceed the consideration being paid by Seaford under the APA by $3.575 million.

[10]    Pursuant to the APA, Seaford has agreed to submit a $2 million Cash Deposit within 48 hours of the entry of a Bidding Procedures Order providing for the payment of the Break-up Fee and Expense Reimbursement. To the extent that a party is submitting a bid on only a portion of the Target Assets, the Debtors will consider such parties Qualified Bidders for purposes of this item if such party submits a Minimum Deposit equal to ten percent (10%) of such party's total cash bid.

(xi)    fully disclose the identity of each entity that will be bidding for the Target Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

To constitute a Qualified Bid for some or all of the Excluded Assets (but <u>not</u> the Target Assets), a bid must be a written irrevocable offer from a Qualified Bidder and

(i)   be an all-cash bid;

(ii)  confirm that the offer shall remain open and irrevocable as provided in the Bidding Procedure;

(iii)  be accompanied with a certified or bank check or wire transfer in an amount equal to ten percent (10%) of the total cash bid, which will be held as a minimum good faith deposit and used to fund a portion of the purchase price provided for in the bid;

(iv)  not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder;

(v)  not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and

(vi)  fully disclose the identity of each entity that will be bidding for the Excluded Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

(c)    <u>Bid Deadline and Submission</u>:  Bids must be received no later than 12:00 noon (prevailing Eastern Time) on the date that is three (3) business days prior to the Auction (as defined below) (the "<u>Bid Deadline</u>") by: (i) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Robert S. Brady, Esq.), counsel to the Debtors; (ii) Allen Family Foods, Inc., 126 N. Shipley Street, Seaford, DE 19973 (Attn: Robert Turley); and (iii) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: David Klauder). After the Bid Deadline, each Qualified Bidder that submits a Qualified Bid will be provided with a copy of any other Qualified Bid(s).

(d)    <u>Auction</u>.  If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline (other than the APA), an auction (the "<u>Auction</u>") with respect to a sale of the Purchased Assets shall take place on the date that is two (2) business days prior to the date of the Sale Hearing **at 10:00 a.m. (prevailing Eastern Time)** at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders, any statutory committee appointed in these cases, Seaford and other invitees. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held.

(e)    Auction Rules.

     (i)    Only a Qualified Bidder and its authorized representatives who have submitted a Qualified Bid will be eligible to participate at the Auction.  At the Auction, only Seaford and Qualified Bidders who have submitted a Qualified Bid will be permitted to increase their bids.  The bidding at the Auction for the Target Assets, and for the Excluded Assets, shall start at the purchase prices stated in the highest or otherwise best Qualified Bids as disclosed to all Qualified Bidders prior to commencement of the Auction (the "Starting Qualified Bids"), and then continue in increments of $250,000.  The Debtors shall not consider any subsequent bid in the Auction unless any bid after the Starting Qualified Bid exceeds the previous highest bid by at least $250,000 in value.  During the course of the Auction, the Debtors shall inform each participant which Qualified Bid reflects, in the Debtors' view, the highest or otherwise best offer.  To the extent that such bid has been determined to be the highest or otherwise best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the APA, or related ancillary agreement or, if applicable, in the Qualified Bid, other than an increase in the cash purchase price, the Debtors shall provide notice to each participant of the value ascribed by the Debtors to any such added, deleted or modified provision or provisions.

     (ii)    Adjournment of Auction. The Auction may be adjourned as the Debtors deem appropriate.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to Seaford, all Qualified Bidders that have submitted a Qualified Bid and counsel to any statutory committee appointed in these cases.

     (iii)    Subsequent Bids by Seaford.  Seaford shall have the right to include the maximum amount of the Expense Reimbursement and Break-Up Fee in the amount of any subsequent bid for the Target Assets that it makes in the Auction and, in the event Seaford is the Successful Bidder for the Target Assets as a result of a subsequent bid made at the Auction, Seaford shall be entitled to credit the maximum amount of the Expense Reimbursement and Break-Up Fee against the Purchase Price payable at Closing.  At any time during the Auction, Seaford may request that the Debtors announce, subject to any potential new bids, the then current Highest and Best Bid, and to the extent Seaford requests, use reasonable efforts to clarify any and all questions Seaford may have regarding the Debtors' announcement of the then current Highest and Best Bid.

(f)    Other Terms.  The Bidding Procedures are subject to such additional terms and conditions as are announced by the Debtors not inconsistent with the Bidding Procedures Order and provisions of the Bidding Procedures specifically provided for in the APA.  At the conclusion of the Auction, (i) the successful bids for the Available Assets shall be the bids made pursuant to the Bidding Procedures Order

that represent, in the Debtors' sole discretion, the highest or otherwise best offers for such assets; and (ii) prior to the entry of the Sale Order(s), the Debtors shall announce their intention to either (a) pursue transactions with the Successful Bidder(s) at the Auction (and announce the identity of the Successful Bidder(s)) or (b) not proceed with sales to the Successful Bidder(s). If an Auction is held, the Debtors shall be deemed to have accepted Qualified Bids only when (i) such bids are declared Successful Bids at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance by the Debtors is conditioned upon approval by the Court of the Successful Bids and the entry of an order or orders approving such Successful Bids.

(g)     Irrevocability of Certain Bids. Successful Bids shall remain irrevocable in accordance with the terms of the purchase agreement executed by the Successful Bidders. The bid of a bidder (the "Back-up Bidder") that submits the next highest or otherwise best bid for the Target Assets or Excluded Assets (the "Back-up Bid") shall be irrevocable until the earlier of (a) 25 days after entry of the Sale Order approving the Successful Bid for the Target Assets or Excluded Assets; (b) closing of the sale to the Successful Bidder or the Back-up Bidder; and (c) such date as the Debtors affirm in writing that the Debtors do not intend to proceed with a sale to the Back-up Bidder; provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date for Seaford be later than December 31, 2011.[11] Following the entry of a Sale Order, if the Successful Bidder fails to consummate the sale because of a breach or failure to perform on the part of the Successful Bidder, the Back-up Bidder will be deemed to have the new successful bid, and the Debtors will be authorized, but not required, to consummate the sale with the Back-up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Minimum Deposit shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.[12]

(h)     Sale Hearing. Prior to July 24, 2011.

(i)     Return of Deposit. Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-up Bid, the Minimum Deposits of all Qualified Bidders that submitted such a deposit under the Bidding Procedures shall be returned upon or within five (5) business days after the conclusion of the Auction. The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale of the Purchased Assets and applied in accordance with the Successful Bid. The Minimum Deposit of the Back-up Bidder shall be returned upon or within the earlier of 25 days after the date of entry of the Sale Order (the "Outside

---

[11]     It should be noted, however, that the DIP Facility requires a closing no later than July 29, 2011.

[12]     Notwithstanding the foregoing, Seaford's obligation to serve as a Back-up Bidder will be governed by the terms of the APA.

<u>Back-up Date</u>") or the closing of the Sale of the Purchased Assets to the Successful Bidder.

(j)    <u>Failure to Close.</u> If the Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason, the Debtors shall: (i) retain the Successful Bidder's Deposit (except in the case of Seaford, whose rights to any deposit shall be governed by the APA); (ii) maintain the right to pursue all available remedies, whether legal or equitable available to them; and (iii) be free to consummate the proposed transaction with the Back-up Bidder at the highest price bid by the Back-up Bidder at the Auction, without the need for an additional hearing or Order of the Court.

(k)    <u>Reservation of Rights</u>. Except as otherwise provided in the APA or the Bidding Procedures Order, the Debtors reserve the right as they may reasonably determine, in consultation with any statutory committee appointed in these cases, the DIP Lender, and the Pre-Petition Lenders, to be in the best interests of their estates, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bids are the highest and best proposals for the Available Assets and which are the next highest and best proposals; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (v) remove some of the Available Assets from the Auction; (vi) waive terms and conditions set forth in the Bidding Procedures with respect to all potential bidders; (vii) impose additional terms and conditions with respect to all potential bidders consistent with the Bidding Procedures; (viii) extend the deadlines set forth in the Bidding Procedures; (x) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (xi) modify the Bidding Procedures as they may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

(l)    <u>Expenses.</u> Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the purchase agreement. Notwithstanding the foregoing, Seaford may recover expenses in accordance with the provisions of the APA.

22.    The Debtors believe that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential purchaser from bidding in a manner permitted, as set forth above.

      

**B.**     **Notice of Auction and Sale Hearing**

23.     The Debtors request that the Court schedule the Sale Hearing prior to July 24, 2011. The Debtors further request that the objection deadline with respect to the sale of the Purchased Assets be at least seven (7) days prior to such hearing.

24.     On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the notice attached as <u>Schedule 2</u> to the Bidding Procedures Order (the "<u>Notice of Auction and Sale Hearing</u>") and the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) counsel for any statutory committee in these cases, if and when appointed; (iii) counsel to the Debtors' Pre-Petition Lenders or their agent; (iv) counsel to the agent for the Debtors' DIP Lenders; (v) all taxing authorities and other governmental agencies having jurisdiction over any of the Available Assets, including the Internal Revenue Service; (vi) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vii) all Persons known or reasonably believed to have asserted an Interest on any of the Available Assets; (viii) the non-Debtor parties to the Executory Contracts and Unexpired Leases; (ix) all Persons known or reasonably believed to have expressed an interest in acquiring all or substantially all of the Available Assets within the last six months; (x) the Attorneys General in the States where the Available Assets are located; (xi) the United States Environmental Protection Agency; (xii) any applicable state environmental agency, and (xiii) counsel for Seaford (collectively, the "<u>Served Parties</u>").[13] In addition to the foregoing, (i) electronic notification of this Motion, the Bidding Procedures Order and the Notice of Auction and Sale Hearing also will be posted on: (a) the

---

[13]     The Notice of Auction and Sale Hearing will direct parties to contact counsel to the Debtors or BMO for more information and will provide that any party in interest that wishes to obtain a copy of any related document (including the APA), subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auction and Sale Hearing.

Court's website, www.deb.uscourts.gov; and (b) http://www.epiqsystems.com/Chapter11.aspx; and (ii) on or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will: (a) serve the Notice of Auction and Sale Hearing on all known creditors of the Debtors; and (b) subject to applicable submission deadlines, publish the Notice of Auction and Sale Hearing once in one or more publications the Debtors deem appropriate, including but not limited to the *Wall Street Journal*.

25.     In addition, to facilitate the sale of the Target Assets and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, the Debtors shall serve a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases (the "Notice of Assumption and Assignment") on all non-Debtor parties to the Executory Contracts and Unexpired Leases, on or before three (3) business days after the entry of the Bidding Procedures Order by first class mail or hand delivery. If the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to a purchaser not set forth in the original Notice of Assumption and Assignment, the Debtors will promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional executory contracts and unexpired leases.

26.     In the Notice of Assumption and Assignment, the Debtors will identify the calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all defaults under the Executory Contracts and Unexpired Leases (the "Cure Amounts"). If no amount is listed on the Notice of Assumption and Assignment to be served, the Debtors believe that there is no Cure Amount applicable to that underlying agreement. The Debtors request that unless the non-Debtor party to an Executory Contract or Unexpired Lease files an objection (the

"Cure Amount/Assignment Objection") to (a) its scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is three (3) business days prior to the Bid Deadline or (ii) ten (10) days after service of the Supplemental Notice of Assumption and Assignment (such later date, "Cure/Assignment Objection Deadline") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline on the same day to: (i) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Robert S. Brady, Esq.), counsel to the Debtors; (ii) Allen Family Foods, Inc., 126 N. Shipley Street, Seaford, DE 19973 (Attn: Robert Turley); and (iii) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: David Klauder, Esq.); then such non-Debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount, and (ii) if the Executory Contract or Unexpired Lease was identified as a Purchased Asset and Seaford is the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, Seaford or such other Successful Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease.

27. The Debtors also request that if an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed

<u>Cure Amount</u>") with appropriate documentation in support thereof. Upon receipt of an objection to a Cure Amount, the Debtors seek authority to, in their sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between the Debtors and the objecting party. So long as the Debtors hold the Claimed Cure Amount in reserve, the Debtors seek authority to assume, assign and/or transfer the Executory Contract or Unexpired Lease that is the subject of an objection without further delay.

28.     In the event that Seaford is not the Successful Bidder for the Target Assets and for those Executory Contracts and Unexpired Leases identified in the Notice of Assumption and Assignment, within two (2) business days after the conclusion of the Auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidder for the Target Assets to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid. The Debtors propose that the non-Debtor parties to the Executory Contracts and Unexpired Leases have until 4:00 p.m. on the date that is two (2) business days prior to the Sale Hearing (the "<u>Adequate Assurance Objection Deadline</u>") to object to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder for the Target Assets can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

**AUTHORITY FOR REQUESTED RELIEF**

**A.      The Sale of the Available Assets is Within the Sound
         Business Judgment of the Debtors and Should be Approved**

29.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

23

to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

30.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with sales of the Available Assets and the Bidding Procedures is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive

and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

31.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

32.    The Debtors submit that more than ample business justification exists to sell the Target Assets to Seaford (or other Successful Bidder) pursuant to the Bidding Procedures, and to sell the Excluded Assets to the highest and best bidder for such assets, thereby satisfying the first prong of *Abbotts Dairies*.  The prompt sale of the Available Assets presents the best opportunity to maximize the value for the estates in light of the need to manage and

transition such Assets to a third-party buyer. In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Available Assets and provide interested parties with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Available Assets by helping ensure a competitive and fair bidding process.

33.     For reasons explained elsewhere herein, the Debtors believe the sale of their businesses and assets must occur quickly in order to maximize value in these cases, and that every day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed herein, the Debtors believe that the going concern value of the Target Assets will be significantly compromised. The success of the Debtors' businesses relies in great part on their reputations as reliable and efficient industry participants. Their customers rely on them for their quality products and their dependability. Every day that the Debtors remain in chapter 11, more of their customers will lose faith in their ability to provide the products on which their own businesses rely. This will lead to customers turning to competitors and result in the Debtors losing significant revenue. It is therefore imperative that the Debtors effect a Sale of the Target Assets as early on in these cases as possible. The Debtors further believe that a targeted sale process is most likely to achieve the highest and best price for the Available Assets and will do so in an efficient and timely manner, enabling the Debtors' businesses to emerge successfully from these cases. The Debtors respectfully submit that the relief sought by this Motion is both reasonable, and indeed

necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders.

34.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Available Assets in the past six months.  Accordingly, the proposed sale of the Available Assets satisfies the second prong of the standard set forth in *Abbotts Dairies*.

35.     The Bidding Procedures are also designed to maximize the value received for the Available Assets.  The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid.  Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Available Assets are ultimately sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of the Available Assets to market testing and permitting prospective purchasers to bid on the Available Assets, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised auction process.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Available Assets will be fair and reasonable, and therefore the Debtors submit that the third prong of the *Abbotts Dairies* standard is satisfied.  As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied under the present facts.

**B.      The Proposed Sales are Proposed in "Good Faith"
         Under Section 363(m) of the Bankruptcy Code**

36.     The Debtors request that the Court find that Seaford (or any other Successful Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Available Assets.

27

37. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

38. Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3d Cir. 1998). In *Krebs*, the Third Circuit considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Executory Contracts and Unexpired Leases are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtors respectfully submit that section 363(m) applies to protect Seaford (or any other Successful Bidder) with respect to both the Executory Contracts and Unexpired Leases and the Purchased Assets.

28

39.     As required by section 363(m) of the Bankruptcy Code, the Bidding

Procedures have been proposed in good faith and provide for both the Debtors and the potential

purchaser to act in good faith in negotiating the sale of the Available Assets and the assignment

of the Executory Contracts and Unexpired Leases.  Although the Bankruptcy Code does not

define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy

Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for

'value'." *Abbotts Dairies*, 788 F.2d at 147.  To constitute lack of good faith, a party's conduct in

connection with the sale must usually amount to "fraud, collusion between the purchaser and

other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.*

(citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  *See also In re*

*Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*,

186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's]

conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y.

1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

40.     Here, the sale of the Available Assets, and the assignment and/or transfer

of the Executory Contracts and Unexpired Leases designated by Seaford in the APA and/or will

be designated by another Successful Bidder,[14] is or will be in good faith.  As discussed

throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale

---

[14]     If the Debtors ultimately sell the Target Assets to an Alternative Purchaser in a Superior Transaction, the
Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code would be
appropriate for the Alternative Purchaser as well.  Pursuant to the Bidding Procedures, any Alternative Purchaser
will have had to present a proposal superior to that of the Purchaser.  Moreover, the Debtors will not choose any
Alternative Purchaser, or any potential purchaser for any of the Excluded Assets, whose good faith under section
363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with
sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy
Code has been satisfied.

agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. All negotiations have been, and will continue to be, conducted on an arms length, good faith basis. Moreover, there is no evidence of fraud or collusion being implicated by the proposed sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, Seaford or any Alternative Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

41.    All Served Parties will receive notice of the sale proposed herein and will be provided with an opportunity to be heard with respect thereto. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided notice of assumption, assignment and/or transfer and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

## C.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

42.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is

written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f) of the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). Because the Debtors expect that they will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Hearing, approving the sale of the Available Assets free and clear of all Interests is warranted.

**D.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved**

43.    To facilitate and effectuate the sale of the Target Assets, the Debtors seek authority to assume, assign and/or transfer various Executory Contracts and Unexpired Leases to Seaford (or any other Successful Bidder) to the extent required by such Purchaser. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business

judgment); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

44.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

45.    Seaford (or any other Successful Bidder) will desire to take assignment of certain executory contracts and unexpired leases related to the Target Assets. To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment and/or transfer, the Debtors believe that they can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearing. The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Target Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Target Assets and assuming, assigning and/or transferring to Seaford (or any other Successful Bidder) the Executory Contracts and Unexpired Leases would be in the best interests of their estates. Moreover, the Debtors will

provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard with respect thereto.

46.    Specifically, the Debtors will serve the Notice of Assumption and Assignment on or before three (3) business days after entry of the Bidding Procedures Order on the non-Debtor parties to the Executory Contracts and Unexpired Leases. The Notice of Assumption and Assignment will, among other things, identify the Cure Amounts, if any, that the Debtors believe are owed on account of each Executory Contract and Unexpired Lease. The Debtors request that unless the non-Debtor party to an Executory Contract and Unexpired Lease files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment and/or transfer to Seaford on or before the Cure Objection Deadline, such non-Debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Unexpired Lease is identified as an Assigned Contract and Seaford is the Successful Bidder for the Target Assets, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, Seaford or such other Successful Bidder or any other assignee of the relevant Executory Contract and Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract.

47.    In the event that Seaford is not the Successful Bidder for the Target Assets and for those Executory Contracts and Unexpired Leases that are included in a Successful Bid,

within two (2) business days after the conclusion of the auction for the Target Assets, the

Debtors will serve a notice identifying the Successful Bidders to the non-Debtor parties to the

Executory Contracts and Unexpired Leases that have been identified in such Successful Bid.

The Debtors request that objections by a non-Debtor party to the Executory Contracts and

Unexpired Leases to the assumption, assignment and/or transfer of such Executory Contract and

Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate

assurance of future performance as required by section 365 of the Bankruptcy Code be filed and

served on or before the Adequate Assurance Objection Deadline.

48.     Thus, the Debtors request that the assumption, assignment and/or transfer

of the Executory Contracts and Unexpired Leases should be approved.

**E.      The Expense Reimbursement and Break-Up Fee are Reasonable and Appropriate**

49.     Approval of the Expense Reimbursement and Break-Up Fee are governed

by standards for determining the appropriateness of bidding incentives in the bankruptcy context

established by the Third Circuit in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re

O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999).  In *O'Brien*, the Third

Circuit held that even though bidding incentives are measured against a business judgment

standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b)

of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding

incentives must provide some benefit to the debtor's estate.  *Id.* at 533.

50.     In *O'Brien*, the Third Circuit referred to nine factors that the bankruptcy

court viewed as relevant in deciding whether to award bidding protections:  (1) the presence of

self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather

than encourages, bidding; (3) the reasonableness of the fee relative to the purchase price;

(4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to

attract other bidders to the auction;" (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." *Id.* at 536.

51.     Whether evaluated under the "business judgment rule" applied by certain courts[15] or the Third Circuit's "administrative expense" standard, the Expense Reimbursement and Break-Up Fee should be approved.  First, all negotiations between the Debtors and Seaford have been conducted in good faith, on an arm's-length basis.  Second, based on the Debtors' pre-filing discussions with potential purchasers, the Debtors have determined that the Expense Reimbursement and Break-Up Fee was necessary to attract, and remains necessary to retain, a stalking horse bidder.  Specifically, Seaford insisted that it receive both of these protections in the event the Debtors determined to sell the Purchased Assets to another bidder.  The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder.  Further, the Debtors will not incur the obligation to pay the Break-Up Fee or the Expense Reimbursement unless a higher and better bid is accepted and such transaction closes.  Thus, any amounts owed on account of the Expense Reimbursement or Break-Up Fee would be covered by the additional

---

[15]     *See*, e.g., *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

proceeds that would be realized from the sale and assignment of the Target Assets pursuant to an alternate transaction with a higher and better bid.

52. While the Bidding Procedures afford Seaford some measure of protection for its "stalking horse" bid by virtue of the Expense Reimbursement and Break-Up Fee, they primarily benefit the Debtors by creating a bidding process that ensures, among other things: (i) structure and certainty to the process; (ii) the Debtors' ability to compare the relative values of competing offers, if any; (iii) that a potential Alternative Purchaser has the financial wherewithal to timely consummate its purchase; and (iv) meaningful bidding increments.

53. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as being appropriate under the facts and circumstances of the case. *See In re Radnor Holdings*, Case No. 06-10894 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *In re Riverstone Networks*, Case No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); *In re Great Kansas City Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (approving expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); *In re Ameriserve Food Distrib., Inc.*, Case No. 00-00358 (PJW) (Bankr. D. Del. Jan. 31, 2000) (Court approved break-up fee of 3.6% or $4,000,000 in connection with a $110 million sale of assets).

54. The Debtors submit that authorization of the Expense Reimbursement and Break-Up Fee will not chill the bidding (if any) for the Target Assets. The Expense Reimbursement and Break-Up Fee were negotiated items and the Debtors believe that they are appropriate under the circumstances because: (i) Seaford is providing a substantial benefit to the

YCST01:11122684.2   070206.1001

estates by acting as a "stalking horse" bidder for the Target Assets; (ii) the APA will provide a floor by which other bids may be judged; and (iii) the Expense Reimbursement and Break-Up Fee afforded to Seaford were conditions to Seaford's entry into the APA. Further, payment of the Expense Reimbursement is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Expense Reimbursement only if they receive from a third party a higher or better offer on the Purchased Assets, and that offer is subsequently approved by Court and closes.

55.     Moreover, absent authorization of the Expense Reimbursement and the Break-Up Fee, the Debtors may lose the opportunity to obtain the highest and best offer for the Target Assets. If these protections are not approved, Seaford will not go forward with the APA. Because approval of the Motion is a prerequisite for going forward with the APA, the Motion is in the best interest of the Debtors' estates.

**F.     Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

56.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

57.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See*

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

58.     Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period applicable under both Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

59.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors shall provide notice of this Motion by facsimile and/or overnight mail to: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) counsel to the Debtors' Pre-Petition Lenders; and (d) the Debtors' cash management banks. In addition, the Notice of Auction and Sale Hearing, the Bidding Procedures Order, and the Notice of Assumption and Assignment will be served as set forth in paragraphs 46-47 above. The Debtors submit that, under the circumstances, no other or further notice is required.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as Exhibit B; (b) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit C; and (c) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware    YOUNG CONAWAY STARGATT & TAYLOR, LLP
       June 10, 2011

                                 */s/ Sean T. Greecher*
                        Robert S. Brady (No. 2847)
                        Sean T. Greecher (No. 4484)
                        Andrew L. Magaziner (No. 5426)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        *Proposed Counsel for the Debtors and Debtors-in-Possession*

YCST01:11122684.2

070206.1001