**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ALLEN FAMILY FOODS, INC., *et al.*, | : | Case No. 11-11764 (KJC) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Hearing Date: June 24, 2011 at 10:00 a.m. |
| | : | Objection Deadline: June 17, 2011 at 4:00 p.m. |
| | : | (extended for UST until June 21, 2011) |
| | : | |
| | : | Re: Docket No. 36 |

**UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BID PROCEDURES IN CONNECTION SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT PROVISIONS; (B)(I) AUTHORIZING AND APPROVING SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF**

In support of her Objection to the motion of the Debtors for entry of orders approving, among other things, bidding procedures for the sale of the Debtors' assets (the "Motion"), Roberta A. DeAngelis, United States Trustee for Region 3 ("U.S. Trustee"), by and through her undersigned counsel, states as follows:

**Introduction**

1. This Court has jurisdiction to hear and determine this Objection.

2. Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33

F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised by this Objection.

**Preliminary Statement**

4. The Break-Up Fee and the Expense Reimbursement serve not as legitimate bid protections, but as blocking protections that unfairly advantage the Stalking Horse Bidder and will ultimately prevent a competitive bidding process from occurring. The Break-Up Fee equals approximately 5% of the likely Purchase Price. The Break-Up Fee and the Expense Reimbursement equal 6% of the likely Purchase Price. These bidding protections are unquestionably high. There is no adequate justification provided by the Debtors for why such a significant amount is necessary here. Moreover, the Debtors propose that the Sale will be approved by this Court within fifty (50) days of the Petition Date. That timeline is extremely fast and constitutes another reason why the Sale process provides an unfair advantage for the Stalking Horse Bidder. For these reasons, the Court should deny approval of the Motion.

**Statement of Facts**

5. On June 9, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On June 16, 2011, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

7. The Debtors propose to conduct a bid and auction procedure in order to sell substantially all of their assets (the "Sale"). The Motion contains a detailed description of various bid procedures that the Debtors seek to approve in conjunction with the Sale.

8. The Debtors negotiated an asset purchase agreement ("APA") with Seaford Milling Company[1] (referred to as the "Stalking Horse Bidder") for the purchase of certain properties and assets owned by the Debtors, which are defined in the Motion as the "Target Assets". The purchase price for the Target Assets equals an initial amount of $30,000,000, plus an additional Final Inventory Amount, which shall not exceed $38,000,000 (the "Purchase Price")[2].

9. The Bid Procedures sought by the Debtors include a break-up fee in the amount of $2,625,000 (the "Break-Up Fee") and an expense reimbursement not to exceed $600,000 ("Expense Reimbursement"). Under the terms of the APA, an order approving the Bid Procedures must be entered within fifteen (15) days of the Petition Date and an order approving the Sale must be entered by July 27, 2011. Bids for any or all of the Debtors' assets must be submitted by July 20, 2011.

10. The Debtors also propose to hold a bid and auction procedure for assets that are not part of the Target Assets being purchased by the Stalking Horse Bidder, which include certain growout farms, farmland, and accounts receivable (the "Excluded Assets").

---

[1] Capitalized terms used in this Objection without definition shall have the meanings ascribed to those terms in the Motion.

[2] According to the Debtors, the realistic figure for the Final Inventory Amount will be between $22-23 million.

**Relief Requested**

11.     The U.S. Trustee objects to the Motion on the basis that the Break-Up Fee is unreasonably high and not appropriate under relevant Third Circuit law. The Break-Up Fee, combined with the Expense Reimbursement, are not actual and necessary costs and expenses of preserving the estate. Moreover, the Break-Up Fee and the Expense Reimbursement unfairly give the Stalking Horse Bidder a significant advantage in the auction process and will only serve to chill any competitive bidding process.

12.     The U.S. Trustee also objects to the Motion because the expediency by which the Debtors seek approval of the Motion and the Sale calls into question whether the Debtors' assets will be adequately marketed and ultimately whether a competitive auction process will take place. In conjunction with the Break-Up Fee and the Expense Reimbursement, this rapid time frame to consummate the Sale is very likely to chill the bidding process.

**Basis for Relief**

**I.     Break-Up Fee and Expense Reimbursement**

13.     The Third Circuit has found that a breakup fee is governed by section 503(b) of the Bankruptcy Code. Specifically, to award a breakup fee (or expense reimbursement) to a potential bidder, the court must determine that the breakup fee was an actual and necessary cost and expense of preserving the estate. *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).

14.     In *O'Brien*, the Third Circuit Court of Appeals stated that ". . . the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d

at 535. The burden is on the Debtors to prove the necessity of, and benefit to the estate from, the proposed breakup fee. Moreover, although "the considerations that underlie the debtor's judgment may be relevant to the bankruptcy court's determination on a request for break-up fees and expenses," "the business judgment rule should not be applied as such in the bankruptcy context." *O'Brien*, 181 F.3d at 535.

15. The Break-Up Fee is unreasonably high in this case. Based on a likely Purchase Price of $53 million, the Break-Up Fee is approximately 5% of the Purchase Price. When the Break-Up Fee is combined with the Expense Reimbursement, these bidding protections equal approximately 6% of the Purchase Price.

16. It is without question that the Break-Up Fee is a large amount. As noted, the Breakup Fee is likely to equal 5% of the Purchase Price.[3] That amount is exceptionally high compared to the accepted percentage of 2-3% for break-up fees in this jurisdiction. The Debtors have not provided sufficient reason to support the Break-Up Fee and the Expense Reimbursement, including satisfying their burden under *O'Brien*.

17. It is likely that the Break-Up Fee and the Expense Reimbursement will serve as a blocking protections that provide an unfair advantage for the Stalking Horse Bidder. These costs simply make it more difficult to propose a qualified bid in the first instance, and ultimately for a spirited auction process to occur. In that respect, the Break-Up Fee and the Expense Reimbursement chill the bidding process, thereby making these costs impermissible under the *O'Brien* standard.

---

[3] Again, the Final Inventory Amount is presently unknown. At maximum amount of the Purchase Price is $68 million. At that figure, the Break-Up Fee equals 3.9% of the Purchase Price, and the Break-Up combined with the Expense Reimbursement equal 4.7% of the Purchase Price. Even at the maximum amount for the Purchase Price, the Break-Up Fee and the Expense Reimbursement are high and present a chilling effect on this auction process.

18. As required by *O'Brien*, the burden is on the Debtors to show that the Break-Up Fee and the Expense Reimbursement are actually necessary to preserve the value of the estate. One of the concerns noted by the Third Circuit in this context is whether a breakup fee will chill bidding and unnecessarily advantage the stalking horse bidder. That concern is certainly at issue here. The Break-Up Fee and the Expense Reimbursement constitute an unusually large percentage of both the Purchase Price and the net amount to be realized by this estate. These bidding protections only serve to hinder the bidding process, not promote a competitive bidding process.

## II. Timing of the Sale

19. The Debtors are proposing an extremely fast timeline to market their assets and consummate the Sale. The Debtors are attempting to sell substantially all of its assets within fifty (50) days of the Petition Date. This is a fast timeline in order to fully consummate a sale of assets. As such, the U.S. Trustee has serious concerns as to whether the assets are being adequately marketed and whether a competitive bidding process is foreclosed as a result of this tight schedule.

20. The Debtors need to demonstrate why this compressed schedule for marketing of the assets and consummation of the Sale is appropriate. While the Stalking Horse Bidder seems to be an appropriate bidder for these assets, the Sale has the unmistakable feel of being rushed through the Bankruptcy Court with all advantages in favor of the Stalking Horse Bidder. It is without question that consummating the Sale within 50 days of the Petition Date is extremely fast. Without compelling reasons to support that the assets will be adequately marketed to help foster a competitive bidding process, the U.S. Trustee objects to the rapid timeline for the Sale.

21. Moreover, the timeline plus the other questionable bidding protections, such as the Break-Up Fee and the Expense Reimbursement, give the Stalking Horse Bidder a significant

6

advantage in this process. The U.S. Trustee argues that this advantage is unfair in this context because these bidding protections make it extremely difficult for competitive bids to be formulated and submitted.

22. The U.S. Trustee leaves the Debtors to their burden and reserves any and all of her rights to, *inter alia*, conduct discovery and to modify, amend, supplement or augment this objection and take whatever other actions are deemed necessary and appropriate.

WHEREFORE, the United States Trustee respectfully requests this Court to issue a ruling denying the Motion, and award such other relief as this Court deems appropriate under the circumstances.

                              Respectfully submitted,

                              ROBERTA A. DEANGELIS
                              United States Trustee

BY:    */s/ David M. Klauder*
        David M. Klauder
        Trial Attorney
        Office of the United States Trustee
        J. Caleb Boggs Federal Building
        844 King Street, Suite 2207
        Wilmington, DE 19801
        (302) 573-6491
        (302) 573-6497 fax

Dated: June 21, 2011