# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLEN FAMILY FOODS, Inc., *et al.*,[1] | Case No. 11-11764 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: July 27, 2011 at 11:00 a.m.**<br>**Objection Deadline: July 20, 2011 at 4:00 p.m.**<br>**(extended to July 22, 2011 at 4:00 p.m. for the**<br>**Committee)** |

## LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BID PROCEDURES IN CONNECTION SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT PROVISIONS; (B)(I) AUTHORIZING AND APPROVING SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through its counsel, hereby submits this limited objection (the "**Sale Objection**") to the Debtors' *Motion for Orders: (A)(I) Approving Bid Procedures in Connection Sale [sic] of Substantially all of the Debtors' Assets; (II) Scheduling Hearing to Consider Sale; (III) Approving Form and Manner of Notice Thereof; and (IV) Approving Break-Up Fee and Expense Reimbursement Provisions; (B)(I) Authorizing and Approving Sale Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Approving Assumption and Assignment of Executory Contracts; and (C) Granting Related Relief* (Dkt. No. 36) (the "**Sale Motion**"). In support of its Sale Objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's tax identification number, are: Allen Family Foods, Inc. (7949), Allen's Hatchery, Inc. (8943), and JCR Enterprises, Inc. (8322).

## PRELIMINARY STATEMENT

1.      Pursuant to the Sale Motion, the Debtors propose to sell certain valuable business assets (the "**Target Assets**") to Seaford Milling Company (the "**Stalking Horse Bidder**") for $30 million plus up to $38 million for the inventory portion of the Target Assets (the "**Proposed Sale**").  While the Committee understands the need for a sale of the Debtors' assets, these cases are hurtling toward administrative insolvency if the Proposed Sale moves forward without substantial modification.

2.      The Proposed Sale, which is the result of an extremely abbreviated sale process, includes the sale of the most valuable business assets of the estates, assumption of painfully few of the Debtors' liabilities, and does not include any provision for payment of the administrative expenses of these bankruptcy cases.  In addition, the failure of the Stalking Horse Bidder to purchase the remaining assets (the "**Excluded Assets**") will likely result in the Excluded Assets being sold piecemeal and at fire-sale prices after the most valuable of the estates' assets – the Target Assets - have been sold, and the Debtors have been stripped of their ability to continue as a going concern.

3.      A sale process that sells off the most valuable assets of the estates while leaving the estates administratively insolvent is clearly impermissible under the Bankruptcy Code.  Therefore, the Committee respectfully requests that the Sale Motion be denied unless a provision is made for payment of all administrative claims (including § 503(b)(9) claims) and the proposed order (the "**Sale Order**") and the Asset Purchase Agreement[2] with the Stalking Horse Bidder (the "**APA**") are modified as set forth herein.[3]

## THE SALE MOTION

4.      Through the Sale Motion, the Debtors are seeking Court authority to sell the majority of their assets pursuant to the terms of the APA.  To accomplish the transactions

---

[2]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

[3]      This Sale Objection is submitted without prejudice to the Committee's rights to assert claims against the Prepetition Lenders pursuant to § 506(c) of the Bankruptcy Code.

contemplated by the APA, the Debtors sought entry of two orders: one approving the bidding procedures, which was entered by this Court on June 24, 2011 [Docket No. 83] (the "**Bidding Procedures Order**"), and the Sale Order, pursuant to which the Debtors request this Court's approval of the Proposed Sale.

5.    As set forth in the Sale Motion, the Debtors seek to sell the Target Assets for $30 million plus the value of the inventory, which value is to be calculated according to a formula expressly set forth in the Sale Motion, but which value cannot exceed $38 million – even if the value of the inventory is greater than $38 million.

6.    As defined by the APA, the Target Assets include "all of the Seller's assets, properties and business of every kind and description and wherever situated, excepting only those assets set forth (and to the extent therein specified) on the *Schedule of Excluded Assets . . . ." APA, § 1.1.* The Excluded Assets which are set forth on the *Schedule of Excluded Assets* consist of the following:

   i.    24 broiler growout farms;

   ii.   Approximately 3,437 acres of farmland;

   iii.  The Debtors' accounts receivables;

   iv.   Prepaid expenses;

   v.    Life insurance policies and cash surrender value;

   vi.   Unamortized loan costs;

   vii.  All tax refunds;

   viii. All machinery, equipment, tools, molds, motor vehicles, trailers, transportation, packing and delivery equipment, supplies, furniture and fixtures located at and used in connection with the Company Farms; and

   ix.   The registered trademark, "Allen's" and the trade rights that adhere thereto.

7.    In addition, the Sale Motion seeks approval of numerous objectionable terms and conditions, as set forth herein.

**The Alternate Bid**

8.     On July 20, 2011, the Debtors received an alternate bid for certain of their assets (the "**Alternate Bid**").  The Alternate Bid was deemed a Qualified Bid[4] pursuant to the Bidding Procedures attached as Schedule 1 to the Bidding Procedures Order.  Because a Qualified Bid was received by the bid deadline, an auction with respect to the sale of the Debtors' assets (the "**Auction**") will take place on July 25, 2011.

## SUMMARY OF COMMITTEE'S OBJECTIONS TO THE SALE MOTION

9.     The Committee is fully cognizant of the importance of a timely sale of the Debtors' assets to the highest and best bidder.  However, the Committee is compelled to bring to the Court's attention certain objectionable aspects of the Proposed Sale.  The following are the Committee's specific objection points:

> a.     The Proposed Sale does not provide funding for the wind-down of the Debtors' estates, nor for payment of all administrative claims (including § 503(b)(9) claims) and priority claims, and leaves the estates administratively insolvent.
>
> b.     The value and extent of the Assumed Liabilities and the Excluded Liabilities are unknown.
>
> c.     The proposed inventory component of the Purchase Price is inadequate and fails to take into consideration the actual value of the Debtors' inventory.
>
> d.     The Proposed Sale does not include a commitment to hire any of the Debtors' current employees, which will result in severe job loss.
>
> e.     The value of the claims and causes of action pursuant to chapter 5 of the Bankruptcy Code (the "**Chapter 5 Actions**"), which the Stalking Horse Bidder intends to purchase, should accrue to the estates unless the Stalking Horse Bidder agrees to waive the Chapter 5 Actions.

---

[4]     As defined in the *Order (I) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets; (II) Scheduling Hearing to Consider Sale of Assets; (III) Approving Form and Manner of Notice Thereof; (IV) Approving Break-up Fee and Expense Reimbursement Provisions; and (V) Granting Related Relief* (the "**Bid Procedures Order**") (Docket No. 83).

f. The APA does not set forth the final allocation of the Purchase Price.

g. The APA includes the assumption of a certain contract that should remain for the benefit of the estates.

h. The APA provides for the execution of a Transition Services Agreement, of which neither the details nor proposed funding are known.

i. The APA sets forth termination events that are outside of the Debtors' control.

j. The APA requires the estates to pay certain fees and expenses that should be borne by the Stalking Horse Bidder.

k. All Notices pursuant to the Sale and the APA must also be provided to the Committee.

l. The proposed releases must not apply if the Prepetition Lenders are named the Highest and Best Bidder.

m. Restrictions on credit bidding are necessary to protect the estates and the unsecured creditors.

n. In the event of a successful Credit Bid (as defined below), the Committee should not be bound by any Order that purports to allow the Prepetition Lenders' claims prior to the expiration of the Committee's lien challenge deadline and final resolution of any filed lien challenge.

o. The proceeds of the Proposed Sale should not be distributed to any secured lender prior to the expiration of the Committee's lien challenge deadline and final resolution of any filed lien challenge.

10. For all these reasons, the Committee respectfully requests that the Court deny the Sale Motion unless the APA and the Sale Order are modified as set forth herein.

## JURISDICTION

11. The Court has jurisdiction to consider the Motion and this Objection under 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of these cases in this District is proper under 28 U.S.C. §§1408 and 1409.

## GENERAL BACKGROUND

12.     On June 9, 2011 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

13.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

14.     No trustee or examiner has been appointed in the Debtors' bankruptcy cases.

15.     On June 16, 2011, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.  [Docket. No. 53].  Also on that day, the Committee selected Lowenstein Sandler PC and Womble Carlyle Sandridge & Rice, PLLC to serve as its counsel.  On June 17, 2011, the Committee selected J.H. Cohn LLP to serve as its financial advisor.

## BASIS FOR RELIEF REQUESTED

16.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

17.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997).  *See also In re Cybergenics Corp.*, 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*) (debtor has a fiduciary duty to maximize the value of the bankruptcy estate).

18.     To accomplish this goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale of a debtor's assets.  *In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring the sale of assets, the courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

19.     In determining whether to authorize the use, sale or lease of property of the estate under § 363(b), courts require the debtor to show that a sound business purpose justifies such actions.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983).

20.     The Committee submits that the Proposed Sale fails to meet the paramount goal of maximizing the proceeds received by the estates, nor have the Debtors shown that a sound business purpose justifies a sale pursuant to the terms of the Proposed Sale.  Therefore, the Committee respectfully requests that the Court modify the Proposed Sale Order pursuant to the objections set forth below in order to accomplish these goals.

## OBJECTION

**A.     The Proposed Sale does not provide funding for the wind-down of the Debtors' estates, or for payment of all administrative claims (including § 503(b)(9) claims) and priority claims, and will leave the estates administratively insolvent.**

21.     The Proposed Sale to the Stalking Horse Bidder will leave the estates with insufficient funds to cover all administrative claims (including § 503(b)(9) claims), priority claims, and the wind-down expenses of these estates, let alone provide any source of recovery to the Debtors' general unsecured creditors.  As this Court stated during the recent DIP hearing in these cases, in response to the Committee's objection to the fact that the Debtors did not provide for the payment of the administrative claims pursuant to the DIP Motion, "he who benefits has to pay the freight . . . ."  *Transcript of Hearing Before Honorable Kevin J. Carey at 8:8-9,* Case no. 11-11764, *In re: Allen Family Foods, Inc.*, *et al.*, (D. Del., June 30, 2011), attached hereto as Exhibit A.

22.     Here, because the Prepetition Lenders are benefiting from the Debtors' bankruptcy filing by, *inter alia*, using the Bankruptcy Court and the Auction process to implement a sale of assets in lieu of multiple state court foreclosure proceedings or a secured party sale, thereby realizing a higher recovery than they might otherwise obtain, the Prepetition

Lenders must pay the freight, which includes making provisions for payment of <u>all</u> administrative claims (including § 503(b)(9) claims) incurred. This point was underscored by the Court at the same hearing in a colloquy with Committee counsel:

> Committee counsel: "I don't want the secured lender to be surprised when we say that this Court should not approve the 363 sale in a chapter 11 case where all chapter 11 admin is not covered including 503(b)(9)."

> The Court: "And the lender shouldn't be surprised if I agree with you."

*Id.* at 21:14-20.

23. The Honorable Christopher S. Sontchi reached the same conclusion in two recent cases – *In re: NEC Holdings Corp., et al.,* No. 10-10890-PJW (Bankr. D. Del. 2010) and *In re Townsends, Inc., et al.,* No. 10-14092-CSS (Bankr. D. Del. 2010).

24. In *NEC Holdings Corp.,* the Court confirmed that the secured creditor must "pay the freight, and the freight is . . . not necessarily a tip to the unsecureds, but the freight is certainly an <u>administratively</u> <u>solvent</u> <u>estate</u>." *Transcript of Hearing at 100:17-20, NEC Holdings Corp., et al.,* (*transcript of July 13, 2010 hearing before Hon. Christopher S. Sontchi; emphasis added*), attached hereto as <u>Exhibit B</u>.

25. Similarly, in *Townsends*, when the Debtors proposed DIP financing that would pay most administrative claims but leave the § 503(b)(9) claims behind, Judge Sontchi stated, "if it appears that the case is administratively insolvent, I would be inclined to . . . either convert or dismiss the case . . . ." *Transcript of [Jan. 21, 2011] Hearing* at 25:8-25:11; 26:10-11, *In re Townsends, Inc., et al.,* No. 10-14092 (CSS) (Bankr. D. Del. 2010), attached hereto as <u>Exhibit C</u>.

26. The Committee's financial advisors have worked with the Debtors' financial advisors to calculate the open administrative and priority claims that are not provided for under the DIP financing or the APA. The following table sets forth a non-exhaustive

summary of the anticipated administrative and priority claims that will remain unpaid and unaccounted for as of the anticipated closing date of the Proposed Sale:

| Type of Claim | Approximate Claim Amount |
|---|---|
| 503(b)(9) Claims | $4 million[5] |
| Potential Employee Claims based on Notice Requirements of State and Federal Law | $2.2 million[6] |
| Professional Fees | $2.8 million |
| **APPROXIMATE TOTAL** | **$9 million** |

27.     In addition to the amounts set forth in the table above, the Debtors may be facing the following additional administrative liabilities:

i.      Pension/PBGC Claims.  The Stalking Horse Bidder is not going to assume any liabilities relating to any pension plans. *Sale Motion,* ¶ 13(e)(ix); APA §1.3.9. The potential liabilities pursuant to the pension plans are largely unknown and undisclosed, with the exception of an asserted liability by the Pension Benefit Guaranty Corporation (the "**PBGC**") in the amount of approximately $2 million that the Debtors are in the process of disputing.  Any additional pension/PBGC liability may include a component that is entitled to administrative priority.

ii.     Union Claims.  The Stalking Horse Bidder is not going to assume the Debtors' collective bargaining agreements,[7] *APA § 1.3.10; Sale Motion, ¶ 13(e)(x),* the unpaid liabilities of which will further increase the insolvency of the Debtors estates. Upon information and belief, the Debtors do not intend to make a proposal to their unions consistent with § 1113 of the Bankruptcy Code.  Absent compliance with § 1113 or consent of the unions, the Debtors will not be able to modify or reject their collective bargaining agreements.  In addition, the Debtors have reported the existence of two litigation matters based on the collective bargaining agreements that may result in administrative liability. *APA § 4.4; also see APA Schedule 4.4.*

---

[5]     The Debtors estimated the 503(b)(9) claims (which include the Critical Vendor claims) at $ 5 million as of the Petition Date.  Since the filing, the Debtors aver that approximately $1 million in Critical Vendor payments have been made which must be credited against these claims.  The Budget provides for an additional $500,000 (approximate) to be paid to holders of 503(b)(9) claims prior to the closing.

[6]     Approximate Claim Amount calculated assuming a sale closing date of July 27, 2011.

[7]     The Debtors are reportedly parties to three (3) separate collective bargaining agreements.

iii.    Severance Agreements. The Debtors have reported "Compensation Continuation Agreements" with nine (9) individuals. *APA § 4.7; see also APA Schedule 4.7.* These agreements may result in additional administrative liability.

iv.    Unpaid Budget Items. In the event certain administrative and priority expenses that are provided for in the DIP financing budget are not actually paid from the DIP financing, the amount of administrative and priority claims that must be paid from the proceeds of the Proposed Sale will be increased, resulting in additional administrative liability to the estates.

28.    Finally, and in addition to the amounts set forth above, the Debtors have made no provision for funding of the wind-down expenses following the Proposed Sale. The anticipated expenses of the wind-down include, but are not limited to: costs and expenses of preserving and liquidating the Excluded Assets if they are not sold at the Auction; payment of accrued post-petition operating expenses; payment of outstanding post-petition liabilities related to self-funded medical and workers compensation plans; payment of post-petition accounts payable; payment of the amounts due pursuant to the *Order Approving Key Executive Incentive Plan and Key Manager Incentive Plan* [Docket No. 173]; and all additional professional fees associated with the wind-down.

29.    During the recent hearing on the DIP Motion, the Prepetition Lenders offered to pay the anticipated employee claims based on notice requirements of state and federal law. Unfortunately, payment of certain administrative claims without payment of all administrative claims is similarly unacceptable under the Bankruptcy Code. As Judge Sontchi explained in *Townsends*, "to go in with a path forward that indicates . . . that a certain type of administrative expense claim won't get paid in full but yet others will, I just – I can't run that kind of case." *Transcript of [Jan. 21, 2011] Hearing* at 23:25–24:9; 24:9-22 (Exhibit C).

30.    The Sale Motion and the APA contemplate the sale of nearly all of the Debtors' assets in a liquidation-type sale. The Stalking Horse Bidder does not appear to be interested in the Debtors' businesses – only the assets – and does not appear inclined to offer continued employment to the Debtors' current employees. After the Proposed Sale, the Debtors'

estates will be saddled with substantial liabilities but will be left with few meaningful assets that can be monetized to provide working capital for the Debtors. Few funds have been set aside for the wind-down of the Debtors' affairs or for the payment of the administrative expenses of the estates. Thus, the Debtors will be administratively insolvent immediately upon the closing of the Proposed Sale, leaving them with no reasonable prospect of confirming a plan, whether of liquidation or of reorganization. Faced with such a predicament, conversion to chapter 7 will be only a blink away, which will result in the liquidation of the remaining assets, and will virtually eliminate the likelihood of any payment of the chapter 11 administrative expenses (including § 503(b)(9) claims), priority claims, or the claims of the general unsecured creditors.

**B.      The value and extent of the Assumed Liabilities and the Excluded Liabilities is unknown.**

31.      The Debtors have provided no evidence of the value and extent of either the Assumed Liabilities or the Excluded Liabilities, nor have the Debtors set forth any evidence to demonstrate that the proposed Purchase Price represents a fair value for the Target Assets. *Sale Motion, ¶13(e).*  Indeed, based on the most recent financial information that has been provided to the Committee, the aggregate total of the amounts listed for the Target Assets in the statements and schedules is significantly higher than the Proposed Sale provides. While the necessity of a sale is undisputed, the Committee strenuously disputes the propriety of a sale which does not provide fair value for the Debtors' assets.

**C.      The proposed inventory component of the Purchase Price is inadequate and fails to take into consideration the actual value of the Debtors' inventory.**

32.      The proposed Purchase Price includes up to $38 million for the as-calculated "value" of the Debtors' inventory based on a physical count that will take place no later than fifteen (15) business days after the closing date. *APA § 2.3; see also Sale Motion, ¶ 13(c).*  The amount that the Stalking Horse Bidder pays for the inventory will be limited to $38 million, regardless of the actual value of the inventory. The amount that the Stalking Horse

Bidder will pay for the inventory will be calculated based on certain express parameters that are set forth in the APA (and discussed below). If the inventory is valued at below $38 million according to the parameters in the APA, the Stalking Horse Bidder will pay only for that value. However, if the inventory is valued at above $38 million, the Stalking Horse Bidder will still only pay a maximum of $38 million. The Stalking Horse Bidder should either pay for the inventory that it receives, or it should remove any excess inventory from the list of Target Assets so the Debtors can sell the excess inventory elsewhere and the value will accrue to the benefit of the estates and the general unsecured creditors.

33.     Upon information and belief, the book value of the Debtors inventory as of the Petition Date, calculated on a first in-first out basis, was approximately $32,813,025. However, the APA provides that the inventory piece of the Purchase Price will be calculated as follows:

> i.      No amounts shall be paid for broiler inventory in excess of $11,000,000. *APA § 2.3(a)(iv).*
>
> ii.     The calculation of the broiler inventory shall be reduced by 25% for all broiler inventory between $5M and $11M. *APA § 2.3(a)(iv).*
>
> iii.    The value of the fuel inventory at Cordova and Harbeson shall be zero. *APA § 2.3(a)(viii).*
>
> iv.     The value of the spare parts inventory, other than JCR spare parts, shall be discounted by 80%. *APA § 2.3(a)(ix).*
>
> v.      The processing ingredient inventory shall be valued at zero. *APA § 2.3(a)(x).*
>
> vi.     The frozen finished goods inventory shall be valued at the lower of (i) seller's cost or (ii) market (net of delivery costs, marketing programs, rebates, and broker's commissions); then discounted 5%. *APA § 2.3(a)(xi).*
>
> vii.    The non-frozen finished goods inventory shall be valued at zero. *APA § 2.3(a)(xi).*
>
> viii.   The cafeteria inventory and packaging materials "shall be valued in accordance with GAAP consistent with the Seller's past practices", with a 10% discount. *APA § 2.3(a)(xii)-(xiii).*

34.     Notwithstanding the above inventory calculations, the APA also provides that the inventory will be "valued at the lower of cost (determined on a first-in, first-out basis ("**FIFO**")) or market value and on a basis consistent with that or prior years." *APA § 4.10.*  It is unclear, therefore, whether the inventory will be valued at the lower of FIFO cost or market (as set forth in *APA § 4.10*), or whether the inventory will be valued according to the above calculations.  Either this provision must be removed or the valuation schemes set forth above must be adjusted accordingly.

**D.     The Proposed Sale does not include a commitment to hire any of the Debtors' current employees, which will result in severe job loss.**

35.     The Stalking Horse Bidder has made no commitment regarding the Debtors' current employees.  Therefore, the Proposed Sale may well leave the Debtors' estates with significant employee priority claims and potentially, post-petition employee related administrative claims, in addition to leaving over 2,300 people immediately out of work.

36.     The APA provides that the Stalking Horse Bidder "is not obligated to hire any Active Employee but may interview or review all Active Employees."  *APA § 6.7.2; see also Sale Motion, § 13(g).*  The APA also provides that the "Purchaser will provide Seller with a list of Active Employees to whom Purchaser will make an offer of employment."  *APA § 6.7.2.* Because the amount and circumstances of any job losses are crucial components to calculating the Debtors' liabilities and future viability, such list of Active Employees must be provided by the Stalking Horse Bidder prior to the consummation of the Proposed Sale.

37.     Further, the Proposed Sale does not provide any funding to handle obligations to terminated employees (such as unused vacation pay, COBRA eligibility, etc.)

E.    **The value of the Chapter 5 Actions, which the Stalking Horse Bidder intends to purchase, should accrue to the estates, unless the Stalking Horse Bidder agrees to waive the Chapter 5 Actions.**

38.    The APA provides that the Stalking Horse Bidder is going to acquire the Chapter 5 Actions, *APA Section 1.1,* but it does not set forth whether the Stalking Horse Bidder intends to pursue the Chapter 5 Actions.  To the extent that the Stalking Horse Bidder will not pursue the Chapter 5 Actions, the Committee has no objection.  However, in the event that the Stalking Horse Bidder is unwilling to waive its right to pursue the Chapter 5 Actions, the actions should not be transferred and the value of the Chapter 5 Actions must accrue to the estates and their creditors.

F.    **The APA does not set forth the final allocation of the Purchase Price.**

39.    The APA provides that "[t]he Purchase Price will be allocated according to the annexed Schedule 2.4.  *APA §2.4.*  Schedule 2.4 states only, "To be mutually agreed upon by Purchaser and Seller upon final determination of the Purchaser Price."  The exact intended allocation of the Purchase Price should be set forth in the Sale Order, and the Committee must be involved in this allocation decision.

G.    **The APA includes the assumption of a certain contract that should remain for the benefit of the estates.**

40.    The APA provides for certain contracts to be assigned to the Stalking Horse Bidder (the "**Assigned Contracts**"). *APA §1.4, Schedule 1.4.*

41.    The list of Assigned Contracts includes a settlement agreement entered into in a litigation action referenced as "Eastern Shore Forest Products," s*ee APA Schedule 1.4(6); also see APA Schedule 4.4(3),* pursuant to which $ 1 million is due to be paid to Debtor Allen's Hatchery in July, 2011.  *APA Schedule 4.4(3).*  This contract should not be assigned to the Stalking Horse Bidder, but should, instead, accrue to the benefit of the estates to lessen the expected administrative insolvency, as discussed above.

**H. The APA provides for the execution of a Transition Services Agreement, for which neither the details nor proposed funding are known.**

42. The APA provides that the Debtors and the Stalking Horse Bidder "shall enter into a transition services agreement" (the "**Transition Services Agreement**") to provide for the transition of the Target Assets from the Seller to the Purchaser and "for the ongoing administration of the Bankruptcy Case." *APA § 6.6; Sale Motion, § 13(f).* The Committee has not been provided with a copy of the Transition Services Agreement. The Court should not approve the Sale Motion with the proposed Transition Services Agreement until the parties in interest have had an opportunity to review and comment on the terms of that agreement, including the sources of funding for the Debtors' proposed obligations thereunder.

**I. The APA sets forth termination events that are outside of the Debtors' control.**

43. The APA provides that "[n]o press release or other announcement to the employees, customers, or suppliers . . . will be issued without the approval of the Purchaser." *APA § 6.2.5.* This provision must be modified to state that the <u>Debtors</u> "shall not make any press release or other announcement to the employees, customers, or suppliers . . . without the approval of the Purchaser, which approval shall not be unreasonably withheld." The Debtors cannot be held responsible for press releases or announcements that are not within their control.

**J. The APA requires the estates to pay certain fees and expenses that should be borne by the Stalking Horse Bidder.**

44. The APA provides that each party shall pay one-half of the transfer taxes that become due through the execution, delivery, and/or recordation of the deeds, vehicle titles, and other instruments of conveyance, *APA § 9.2.1,* and one-half of the filing fee pursuant to Hart Scott Rodino, *APA § 12.9.2.* Except for the transfer taxes that become due pursuant to transfers of real property located in the state of Delaware (which are apportioned equally between grantor and grantee by statute, *see 30 Del.C. § 5402*), these costs should be borne by the Stalking Horse Bidder, and not by the estates.

**K.** **All Notices pursuant to the Sale and the APA must also be provided to the Committee.**

45.     In all cases in the APA and the Sale Order where notice is provided to the Lenders and/or the Debtors, notice should also be provided to the Committee.  *See, e.g., APA § 12.7.*

**L.** **The proposed releases must not apply if the Prepetition Lenders are declared the Highest and Best Bidder.**

46.     The APA provides for the release and waiver of any and all claims and causes of action against the "Highest and Best Bidder" "and any of its affiliates, its successors and assigns . . . , except for liabilities and obligations under the Purchase Agreement." *Proposed Sale Order, ¶ W.*  Should the Prepetition Lenders decide to Credit Bid and be declared the Highest and Best Bidder, such extensive releases of claims are overreaching and unwarranted and must be modified to apply solely to the purchase transaction, and not to the prepetition or DIP lending relationship.

**M.** **Restrictions on credit bidding are necessary to protect the estates and the unsecured creditors.**

47.     The Sale Motion and APA are silent on the issue of credit bidding.  If allowed, the Prepetition Lenders may submit a bid or bids that offset their alleged secured claims against the Purchase Price of the property (a "**Credit Bid**") pursuant to Bankruptcy Code § 363(k).  However, § 363(k) expressly grants the court discretion to deny a creditor's ability to credit bid "for cause."  Cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."  *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).  The language of § 363(k) permits the Court to specifically restrict the ability to credit bid.  *Id.*; *see also In re Philadelphia Newspapers, LLC,* 599 F.3d 298 (3d Cir. 2010).

48.     As the alleged liens and security interests associated with the Debtors' prepetition obligations have not yet been proven valid and enforceable, it is appropriate for the

Court to exercise its discretion pursuant to § 363(k) to prevent an inadvertent declaration of the validity and extent of the Prepetition Lenders' purported liens and security interests.

49.     Limiting a secured lender's ability to credit bid or putting in place certain protections that safeguard the debtor's unsecured creditors is not novel.  *See e.g., In re Akard St. Fuels, L.P.*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (in which the court denied the lender's ability to credit bid and take the debtor's assets free and clear of all liens where the lender's liens were still subject to a challenge); *In re Miami General Hospital, Inc.,* 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens).

50.     The Committee is currently investigating the Prepetition Lenders' purported liens and security interests and until the extent, priority and validity thereof have been established, the Prepetition Lenders' ability to Credit Bid should be restricted.  The Committee's investigation has revealed that the Prepetition Lenders may not have perfected their liens on a number of assets, including, but not limited to, certain of the Debtors' intellectual property, certain vehicles, and certain bank accounts.  Until the Committee's lien challenge period has expired and any filed lien challenges have been resolved, the Prepetition Lenders should not be permitted to Credit Bid.

51.     Alternatively, should the Prepetition Lenders be permitted to Credit Bid, that bid must not include the value of any assets on which the perfection of liens is disputed, and must include a cash component sufficient to: (a) satisfy all chapter 11 administrative expenses and priority claims; (b) provide sufficient funding for the plan process and the expenses that will accrue during the post-sale wind-down period; and (c) provide for a recovery for unsecured creditors.

**N.** **In the event of a successful Credit Bid, the Committee should not be bound by any Order that purports to allow the Prepetition Lenders' claims prior to the expiration of the Committee's lien challenge deadline and final resolution of any filed lien challenge.**

52.     In the event the Court is inclined to allow the Prepetition Lenders to Credit Bid, the Credit Bid and any order entered in response thereto must state that the Prepetition Lenders' purported liens and security interests are not held to have been found valid thereby.  As this Court held in *In re Radnor Holdings Corp.,* 353 B.R. 820 (Bankr. D. Del. 2006), the entry of an order permitting a credit bid is tantamount to an order approving the nature, extent and validity of the underlying lien claim and may preclude litigation against the lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling or other litigation claims, unless those rights are expressly reserved. *Id*. at 846.  Therefore, to the extent that any order entered in response to the Sale Motion has the legal effect of allowing the alleged secured claims of the Prepetition Lenders against the Debtors' estates, such order should not be binding on the Committee until the expiration of the Committee's lien challenge period and final resolution of any lien challenge filed.

**O.** **The proceeds of the Proposed Sale should not be distributed to any secured lender prior to the expiration of the Committee's lien challenge deadline and final resolution of any filed lien challenge.**

53.     Finally, because the Committee's lien challenge deadline is not scheduled to occur until after the closing of the Proposed Sale, the Sale Order must provide that the proceeds of the Proposed Sale must not be distributed until the Committee's lien challenge deadline has passed, and until any lien challenge filed has been brought to a final resolution. Failure to delay the distribution of the proceeds may result in an additional layer of expense to recover the funds for the estates, should a lien challenge prove successful.

## RESERVATION OF RIGHTS

54.     The Committee expressly reserves its rights to raise additional or further objections to the Sale Motion, proposed Sale Order, and Proposed APA at any time, including at the hearing on the Sale Motion.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Sale Motion or, in the alternative, modify the relief sought as necessary to incorporate the concerns and objections of the Committee set forth herein; and (ii) grant the Committee such other and further relief as the Court deems just and proper

Dated:  July 22, 2011                    Respectfully submitted,

**LOWENSTEIN SANDLER PC**

Bruce Buechler, Esq.
Bruce S. Nathan, Esq.
Jeffrey D. Prol, Esq.
Timothy R. Wheeler, Esq.
Suzanne Iazzetta, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

-- and --

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

By: /s/ *Steven K. Kortanek* _____
Steven K. Kortanek, Esq. (DE Bar No. 3106)
222 Delaware Avenue, Suite 1501
Wilmington, DE  19801
Telephone: 302-252-4363
Facsimile: 302-661-7728

*Co-Counsel for the Official Committee of Unsecured Creditors*