# **EXHIBIT 1**

JCR AGREEMENT

COPY

# RAW MATERIAL PURCHASE AND SALE AGREEMENT

THIS RAW MATERIAL PURCHASE AND SALE AGREEMENT ("Agreement") is entered into as of the 27th day of SEP, 2004 by and between MOUNTAIRE FARMS OF DELAWARE, INC. ("SELLER"), and JCR ENTERPRISES, INC. ("BUYER").

## WITNESSETH:

WHEREAS, SELLER engages in the business of poultry processing and sells various poultry by-products as a result of such poultry processing; and

WHEREAS, BUYER is engaged in the business of purchasing such by-products and processing them into poultry protein and fat and other finished products at BUYER'S rendering facility; and

WHEREAS, SELLER and BUYER desire to enter into this Agreement regarding, inter alia the sale by SELLER to BUYER of certain of its poultry by-products produced by SELLER at SELLER'S Millsboro, Delaware poultry processing plant, upon and subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto now agree as follows:

1. **Purchase and Sale of Materials** Beginning on DEC 6, 2004, BUYER agrees to buy, and SELLER agrees to sell poultry by-products (the "Materials") with the exception of sludge (DAF) produced by SELLER, upon and subject to the terms and conditions set forth herein and in Schedule A attached hereto, all of the terms and conditions of which are hereby incorporated by reference. The parties recognize that the quantity of the Materials will increase or decrease from time to time due to variations in the established slaughter schedules and holidays when no slaughter occurs. BUYER and SELLER agrees that if the volume of poultry by-products produced by SELLER exceeds Six Million pounds weekly attempts will be made to negotiate a new Agreement. BUYER and SELLER agrees that SELLER may sell Material ( i.e., paws, entrails, parts, whole birds ) to other entities such as pet food companies. SELLER agrees not to sell any of the Materials to any other rendering facility without written consent of BUYER. If SELLER desires to operate its processing plant on Saturday, SELLER agrees to inform BUYER by no later than 10 a.m. via fax on Thursday of the same week. This enables BUYER the time needed to provide notice to employees and to purchase fuel for operations.

2. **Disposition of Materials.** BUYER will provide trailers for the loading of Materials by SELLER. SELLER agrees not to overload trailers. BUYER will transport loaded trailers from SELLER'S location to BUYER'S rendering plant.

1

3. **Term of Agreement.** The initial term of this Agreement shall be for a period commencing on _DEC 6_, 2004 and ending upon the _27th of DEC_, 2008 hereof (the "Term"). At the end of the initial Term, the Agreement shall automatically continue for one year successive renewal Terms unless either party provides written notice to the other party of termination at least one hundred eighty (180) calendar days prior to the end of the applicable initial or renewal Term. Notwithstanding anything herein to the contrary, this Agreement shall survive the sale of a controlling interest in, or of all or substantially all of the respective assets of, either BUYER or SELLER to any third party.

4. **Purchase Price.** BUYER will pay to SELLER the purchase prices for the Materials based on previous week's average sales for finished products and pursuant to Schedule A.

5. **Indemnity.** Each party will indemnify and hold the other party harmless from and against all expense, loss, claim, damage or liability resulting from damage to property or injury to persons, including death, arising directly or indirectly from or in connection with such party's obligations, breaches or omissions under this Agreement by it, and will at its own cost defend any legal proceedings brought against the other party in connection therewith. Notwithstanding anything herein to the contrary, this Section 5 shall survive any termination of this Agreement.

6. **No Assignments.** Except as otherwise provided in Section 3 of this agreement pursuant to which the rights and obligations of the parties under this Agreement may be assigned and shall survive the sale of a controlling interest in, or of all or substantially all of the respective assets of, either BUYER or SELLER, or the sale by SELLER of it's poultry plant, or the sale by BUYER of its rendering plant to any third party, neither party shall assign this contract or any interest herein, either voluntarily or by obligations of law, or sub-contract the performance of any obligations hereunder, without the prior written consent of the other.

7. **Notice.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the fifth day after mailing by first class U.S. mail, postage paid, to the party to whom notice is to be given.

   To SELLER:

   Mountaire Farms of Delaware, Inc.
   P.O. Box 1320
   Millsboro, Delaware 19966
   Attention: Mr. Walter Moorhead

   To BUYER:

   JCR Enterprises, Inc.
   126 North Shipley Street
   Seaford, Delaware 19973
   Attention: Mr. Michael E. Pilcher
   Vice President of Operations

2

8. **Further Agreements.** The parties agree to cooperate with one another in the execution of any further instruments or documents that may be necessary, appropriate or convenient to the furtherance of the transactions contemplated by this Agreement.

9. **Captions.** The captions used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify its terms or provisions.

10. **Invalid Provisions.** Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such provision of invalidity, without invalidating the remainder of such provisions or the remaining provisions of the this Agreement.

11. **Amendment.** This agreement, or any provision thereof, may be waived or amended only by an instrument in writing, executed by the party against whom such waiver or amendment is to be enforced. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver or any separate though similar event.

12. **Multiple Counterparts.** This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Governing Law.** This agreement shall be construed in accordance with the laws of the State of Delaware applicable to contracts between Delaware residents entered into and to be performed entirely within such state.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Mountaire Farms of Delaware, Inc.

WWM
9/30/04

By: _[signature]_

Title: V.P. Processing Operations

Seller

JCR Enterprises, Inc.

By: _[signature]_

Title: VP OPERATIONS

Buyer

3

## Mountaire Farms of Delaware, Inc.
## Schedule "A"
## Addendum to Raw Material Purchase and Sale Agreement

Contract Dated SEP 29, 2004

I. **Buy Back Agreement.** SELLER will have first option on purchasing finished product produced by SELLER'S raw material at market value set by BUYER.

II. **Purchase Price of Inedible By-Product:**

a. Yield Basis: Schedule A details the yield basis to be used to calculate the gross value of each inedible by-product sold by SELLER to BUYER.

b. A $7.00/Ton freight cost will be deducted from the gross value of fat and poultry meal purchased by SELLER.

c. A service charge to Seller will be applied against all scaled tons.

d. **Raw Material Weight:**

   1. Offal will be purchased on actual scale weight not to exceed 16% of live weight killed.

   2. Feathers will be purchased on actual scale weight not to exceed 10% of live weight killed.

   3. DOA's, Condemned Whole Birds and parts and other meat type inedible products shall be paid for on the basis of customer's actual weights. DOA's will be separated by the supplier and put on a designated trailer for collection. In the event DOA's can not be separated a mutual agreement will be negotiated.

   4. Blood will be collected and the service charge per ton applied on all tons over 3.3% of live weight killed.

   5. Weight Discrepancies, in the event there is a discrepancy between SELLER total weekly weights and BUYER'S total weights of more than 5% of SELLER total scaled weight, the differences will be split and added to the lightest weight. The offal pounds will be adjusted to reflect the entire variance.

4

## III. Raw Material Quality

SELLER, acknowledges and agrees that it is aware that BUYER has a quality assurance policy at its plant facility, stated above, that addresses Hazard Analysis of Critical Control Points (HACCP). A copy of this HACCP plan is attached and incorporated hereto, as Schedule "B". SELLER agrees to diligently comply with the terms of BUYER'S HACCP program and shall ensure that the raw material supplied under the Agreement is free from foreign material including but not limited to garbage, trash, plastic, rubber and chemicals. In the event that the raw material supplied by SELLER shall fail to meet BUYER'S HACCP criteria, BUYER shall issue a notification of deficiency to the SELLER in the form of a Supplier Corrective Action Report. In the event that SELLER received two (2) or more supplier Corrective Action Reports in a month and the BUYER determines that the problems have not been resolved by the SELLER, the raw material will be at no value, and BUYER shall not be obligated to pay SELLER. Once SELLER has satisfactorily resolved the raw material deficiencies, BUYER shall begin to compensate SELLER for the raw material it supplies under the Agreement that meets HACCP criteria, but shall not be liable to SELLER for any non-payments for material received that was deemed by BUYER to be "no value" material.

## SCHEDULE A
## YIELDS

|  | FAT | P.M. | F.M. |
|---|---|---|---|
| OFFAL | 15.15% | 19.25% |  |
| DOA'S | 15.15% | 19.25% |  |
| CONDEMNED WHOLE &PARTS | 15.15% | 19.25% |  |
| NECKS | 15.15% | 19.25% |  |
| BACKS & RIB CAGES | 15.15% | 19.25% |  |
| FAT | 50.00% | 2.00% |  |
| SKINS | 31.00% | 8.00% |  |
| ORGANS | 9.00% | 23.00% |  |
| BONES | 6.00% | 31.00% |  |
| MDM |  | 30.00% |  |
| FEATHERS |  |  | 28.00% |

5

## COLLECTION, FIXED & VARIABLE CHARGE/TON
(Processing Service Charge)

| 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Cost plus $8.00 per ton | Cost plus $8.00 per ton | Cost plus $8.00 per ton | Cost plus $8.00 per ton | Cost plus $8.00 per ton |

\* The processing service charge is based on actual cost plus $8.00 per ton. The service charge will be adjusted monthly. Any adjustments (credits or debits) from the previous month will be applied to the second week's raw material value. The first month's processing service charge will be $64.00. SELLER will be provided with a summary of the actual cost. Upon request, detailed documentation can be reviewed at the corporate office located at 126 North Shipley Street Seaford, Delaware 19973

Witness: [signature]

JCR Enterprises, Inc. (BUYER)
By: [signature] Michael Gilespie
Title: VP OPERATIONS
Date: 9/29/04

Witness: Walter Monhard 9/30/04

Mountaire Farms of Delaware, Inc. (SELLER)
By: [signature]
Title: V.P. PROCESSING OPERATIONS
Date: 09.30.04

6

# AMENDEMENT #1 – RAW MATERIAL PURCHASE AND SALE AGREEMENT

THE RAW MATERIAL PURCHASE AND SALE AGREEMENT ("Agreement") dated September 29, 2004 by and between Mountaire Farms of Delaware, Inc. ("SELLER"), and JCR Enterprises, Inc. ("BUYER"), is hereby Amended as follows:

Term of Agreement - The term of this agreement will automatically and continually renew until such time that either party provides written notice, to the other party, of termination. The agreement will then terminate thirty six months (36) from the date of proper termination notice with no further obligations of BUYER or SELLER. Notwithstanding anything herein to the contrary, this Amendment shall survive the sale of a controlling interest in, or of all or substantially all of the respective stock and or assets of either BUYER or SELLER to any third party.

Collection, Fixed & Variable Charge/Ton (Processing Service Charge) Effective January 1, 2009 the Collection, Fixed & Variable Charge/Ton shall be $9.00 per raw ton. Should non-productivity related issues increase substantially, a new Collection, Fixed & Variable Charge/Ton will be renegotiated.

Purchase and Sale of Materials.-BUYER AND SELLER agree the volume of poultry by-products produced by SELLER shall not exceed six million (6,000,000) pounds weekly.

~~Purchase Price of Inedible By-Products. - A $9.00/Ton freight cost will be deducted from the gross value of fat and poultry meal purchased by SELLER effective January 1, 2009.~~

All other non-affected sections of the September 29, 2004 Agreement shall remain.

As entered into as of the __27__ day of __JUNE__ 2007.

IN WITNESS WHEREOF, the parties have executed this Amendment.

Mountaire Farms of Delaware, Inc.

By: _____

Title: PRESIDENT

Seller

JCR Enterprises, Inc.

By: _____

Title: VP Operations

Buyer